**MARYLANDERS FOR FAIR REPRESENTATION, INC., et al.**

v.

**William Donald SCHAEFER, et al.**

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, INC., et al.**

v.

**William Donald SCHAEFER, et al.**

**Civ. Nos. S–92–510, S–92–1409.**

United States District Court, D. Maryland.

Oct. 14, 1992.

David D. Queen and Randall L. Hagen, Ober, Kaler, Grimes & Shriver, Baltimore, Md., for plaintiffs Marylanders For Fair Representation, Inc.

Dennis C. Hayes, Gen. Counsel and Samuel L. Walters, Asst. Gen. Counsel, N.A.A.C.P., Deborah A. Jeon and Susan Goering, American Civ. Liberties Union, Baltimore, Md., and Peter C. Forbes, Leslie J. Cloutier, Micki M. Chen and Joseph P. Savage, Morrison & Foerster, Washington, D.C., for plaintiffs N.A.A.C.P.

Evelyn O. Cannon, Carmen M. Shepherd and Lucy A. Cardwell, Assts. Atty. Gen., Baltimore, Md., and Robert A. Zarnoch and Kathryn M. Rowe, Assts. Atty. Gen., Annapolis, Md., for defendants William Donald Schaefer, State Administrative Bd. of Election Laws, Winfield M. Kelly, Jr., Thomas V. Miller, Jr. and R. Clayton Mitchell, Jr.

1. Marylanders for Fair Representation, Inc. is alleged to be "a not-for-profit, non-partisan corporation organized ... for the purpose of taking such action as may be necessary to assure that Congressional and legislative districts in Maryland shall conform to the laws, Constitution and census of the United States and that they be fair and equitable." MFFR Amend.Compl. at ¶ 7.

2. Plaintiffs also include Maryland's NAACP-affiliated chapters as well as numerous private individuals.

3. Additional defendants are the State Administrative Board of Election Laws ("Election Board"); Gene M. Raynor, State Administrator of Election Laws; Winfield M. Kelly, Jr., Secretary of State for the State of Maryland; Thomas V. Miller, Jr., President of the Maryland State Senate; and R. Clayton Mitchell, Jr., Speaker of the Maryland House of Delegates.

Before MURNAGHAN, Circuit Judge, and MOTZ and SMALKIN, District Judges.

## MEMORANDUM OPINION

SMALKIN, District Judge.

## I. INTRODUCTION

Appended to this Memorandum Opinion is a separate opinion of Judges Murnaghan and Motz in which they differ from the undersigned with regard to the persons who may assert the legislative privilege. In all other aspects, however, they concur in the opinion as set forth below.

This matter is before the Court for resolution of certain discovery disputes between the plaintiffs, Marylanders for Fair Representation ("MFFR")[1] and the National Association for the Advancement of Colored People ("NAACP")[2], and the defendants, Governor William D. Schaefer and various state officials[3]. These two cases involve a number of challenges[4] to the constitutionality of the Maryland state legislative redistricting plan ("the Plan"), as enacted by the Maryland General Assembly during its 1992 session.[5] Pursuant to 28 U.S.C. § 2284 (West 1978 & Supp.1992), a three-judge court has been convened to consider the issues raised in these cases.

■ The NAACP Plaintiffs have moved under Fed.R.Civ.P. 42(a) to consolidate their action with that filed by the MFFR. Because these two suits involve common

4. Plaintiffs' complaints allege, *inter alia,* that the Governor's Plan (1) is the product of political gerrymandering, (2) violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, (3) violates 42 U.S.C. § 1983, and (4) violates both the Fourteenth (one person–one vote/single & multi-member districts) and Fifteenth (dilution of minority voting strength) Amendments of the United States Constitution.

5. The Maryland Constitution confers original jurisdiction upon the Maryland Court of Appeals to consider constitutional challenges to redistricting plans. Challenges similar to those here are being pursued simultaneously in the Maryland court system. (*See* Memorandum & Order, 795 F.Supp. 747, 748 (D.Md.1992).)

questions of law and fact and consolidation will tend to avoid unnecessary costs and delay, combining the two cases for all future proceedings will serve the objectives of Rule 42(a). Accordingly, an Order will be entered separately, consolidating the above captioned cases for discovery purposes and for all future hearings, including trial.

In their pleadings, plaintiffs request both declaratory and injunctive relief. Specifically, plaintiffs seek to have the Governor's redistricting Plan declared unconstitutional and to have this Court prohibit the defendants from holding legislative elections based upon the Plan's boundaries. (MFFR Amend.Compl. ¶¶ 1 & 2, NAACP Compl. at ¶ 1.) Further, the plaintiffs ask this Court to fashion such relief as may be required to achieve a constitutional legislative districting plan for the state of Maryland.

Pursuant to this Court's July 24, 1992 scheduling Order, plaintiffs filed proposed discovery schedules, which included general requests for documentary evidence as well as deposition testimony from relevant party and non-party witnesses. The defendants responded to and strongly opposed the plaintiffs' proposals, and the plaintiffs, in turn, filed their opposition to the defendants' suggested discovery limitations. This Court held a discovery hearing on September 17, 1992 to resolve the major discovery disagreements.

The three central discovery disputes as set forth by the parties in their papers and at the hearing are as follows: (1) whether the existence of legislative immunity precludes the deposition of defendants Thomas V. "Mike" Miller, Jr., President of the Senate and R. Clayton Mitchell, Jr., Speaker of the House of Delegates, as well as any inquiry into legislative "motive" concerning the introduction of the redistricting plan; (2) whether the work-product doctrine bars the deposition of, or discovery concerning, Dr. Allan J. Lichtman, the state's redistricting consultant; and (3) whether discovery should be bifurcated in order to confine plaintiffs' initial inquiry to issues not related to discriminatory intent. Each of these issues will be addressed in turn.[6]

## II. FACTUAL BACKGROUND

The redistricting plan at issue here was submitted to the General Assembly by Governor Schaefer pursuant to his state constitutional mandate. Under Article III, § 5 of the Maryland Constitution, the Governor is required, following each decennial census and after public hearings, to propose a plan for setting the boundaries of legislative districts for electing members to the Maryland Senate and House of Delegates and to the United States Congress[7]. After the Governor's plan has been submitted, the General Assembly may introduce and adopt an alternative plan for redistricting the state. If, however, the General Assembly fails to act (either by ratifying the Governor's plan or one of its own) within 45 days from the introduction of the Governor's proposal, the Governor's plan becomes law.

---

**6.** In addition, the defendants filed a Motion to Dismiss Defendants Mitchell and Miller.

**7.** Article III, § 5 reads, in pertinent part, as follows:

> Following each decennial census of the United States and after public hearings, the Governor shall prepare a plan setting forth the boundaries of the legislative districts for electing of the members of the Senate and the House of Delegates.
>
> The Governor shall present the plan to the President of the Senate and Speaker of the House of Delegates who shall introduce the Governor's plan as a joint resolution to the General Assembly, not later than the first day of its regular session in the second year following every census, . . . . The plan shall conform to Sections 2, 3, and 4 of this Article.

> Following each decennial census the General Assembly may by joint resolution adopt a plan setting forth the boundaries of the legislative districts for the election of members of the Senate and the House of Delegates, which plan shall conform to Sections 2, 3, and 4 of this Article. If a plan has been adopted by the General Assembly by the 45th day after the opening of the regular session of the General Assembly in the second year following every census, the plan adopted by the General Assembly shall become law. If no plan has been adopted by the General Assembly for these purposes by the 45th day after the opening of the regular session of the General Assembly . . . the Governor's plan presented to the General Assembly shall become law.

On May 14, 1991, following completion of the 1990 federal census, Governor Schaefer appointed a five-member Redistricting Advisory Committee ("the Committee"), to assist him in the formulation of new legislative and Congressional districting plans.[8] The five-member committee was comprised of two legislators and three private citizens. Members included Thomas V. "Mike" Miller, Jr., President of the Senate; R. Clayton Mitchell, Jr., Speaker of the House of Delegates; Donna M. Felling; Norman M. Glasgow, Sr.; and Benjamin L. Brown, chairman of the Committee.[9] The purpose of the Committee was to "make recommendations to the Governor and General Assembly on boundary changes for legislative and Congressional election districts" reflecting population shifts as recorded in the 1990 census. *1991–92 Maryland Manual*, at 486.

In December of 1991, the Committee recommended a legislative redistricting plan to the Governor. The Governor made minor changes to the plan and introduced it to the General Assembly on January 8, 1992, the first day of the 1992 session. (MFFR Amend.Compl. at ¶ 27.) The General Assembly did not amend the Governor's plan nor did it enact an alternative plan; thus, on February 22, 1992, the 45th day of the 1992 session, the Governor's plan became law. The present actions were filed shortly thereafter.

### III. LEGISLATIVE IMMUNITY

Plaintiffs' wide-ranging discovery proposals include the customary interrogatories, requests for documentary evidence and admissions, and depositions of both fact and expert witnesses. Specifically, plaintiffs intend to inquire, *inter alia*, into "the reapportionment criteria that the defendants used in developing ... the state legislative plan" and "defendants' reasons for rejecting alternative redistricting plans submitted by the NAACP plaintiffs or third parties." (NAACP Pls.' Proposed Schedule of Discovery, at 6.) Plaintiffs also intend to depose, among others, the members of the Governor's Advisory Committee (including defendants Mitchell and Miller), and selected additional "non-party" members of the Maryland General Assembly. (*Id.* at 8, MFFR Pls.' Proposed Schedule of Discovery, at 3.) In opposition, defendants contend that much of the plaintiffs' proposed inquiry into the legislative motivation behind the Governor's Plan is barred by the doctrine of legislative immunity. (Defs.' Resp. to Proposed Discovery, at 2–3.) Defendants argue that the "preparation and discussion of a legislative redistricting plan, consideration of alternatives, and voting to approve or reject such a plan, are legislative acts within the protection of legislative privileges." (*Id.* at 17.) All parties recognize that if defendants' claims of legislative immunity are accepted, plaintiffs' discovery efforts in this case would be substantially curtailed.

### DOCTRINE OF LEGISLATIVE IMMUNITY

The doctrine of absolute legislative immunity for members of the United States Congress stems from the Speech or Debate Clause of the Constitution.[10] The Clause is designed to shield legislators from the threat of possible prosecution by an un-

---

**8.** This committee was not the first of its kind. In 1981, then Governor Harry Hughes also appointed a five-member advisory committee to aid in the development of a new districting plan. *See Matter of Legislative Districting,* 299 Md. 658, 667, 475 A.2d 428, 432 *appeal dismissed sub nom. Wiser v. Hughes,* 459 U.S. 962, 103 S.Ct. 286, 74 L.Ed.2d 272 (1982). It appears that Maryland Constitution Article II, § 24 (Reorganization of Executive Branch) provides Governor Schaefer the authority to appoint the Advisory Committee, although this Court found no specific reference to that section by the parties to these actions.

**9.** The membership of the Committee appears to be the result of a political compromise between the office of the Governor and the leaders of Maryland's General Assembly. *See, e.g.,* "Assembly leaders, Schaefer spar over redistricting panel," *The Baltimore Sun,* May 8, 1991.

**10.** U.S. Const. Art. I § 6. "[F]or any Speech or Debate in either House, they [Representatives and Senators] shall not be questioned in any other Place." Article III, § 18 of the Maryland Constitution has a similar provision, providing that "[n]o Senator or Delegate shall be liable in any civil action, or criminal prosecution, whatever, for words spoken in debate."

friendly executive and conviction by a hostile judiciary. *United States v. Johnson,* 383 U.S. 169, 181, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966). The common-law immunity for *state* legislators was first recognized in *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019, *rehg. denied,* 342 U.S. 843, 72 S.Ct. 20, 96 L.Ed. 637 (1951). The *Tenney* Court created absolute immunity from civil suit[11] for state legislators acting within "the sphere of legitimate legislative activity." *Id.* at 376, 71 S.Ct. at 788. The protection against civil liability extends to suits for injunctive and declaratory relief, such as those currently before this Court. Although the *Tenney* court did not base its decision upon the Speech or Debate clause, it did discuss the historical underpinnings and policy rationales for the Clause in support of its holding. *See generally Corporacion Insular de Seguros v. Garcia,* 709 F.Supp. 288 (D.P.R.1989), *appeal dismissed,* 876 F.2d 254 (1st Cir.1989). The *Tenney* court acknowledged that the privilege of legislators to act without fear of arrest or civil prosecution can be traced back to the Framers' attempts to avoid the parliamentary struggles common in Sixteenth and Seventeenth Century England.

*Tenney,* 341 U.S. at 372, 71 S.Ct. at 786. In explaining the necessity of the privilege, the *Tenney* Court noted that:

> Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.

*Id.* at 377, 71 S.Ct. at 788. *Cf. Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 402–06, 99 S.Ct. 1171, 1177–80, 59 L.Ed.2d 401 (1979) (extending *Tenney* to hold that "regional legislators," to the extent they act in a capacity comparable to members of a state legislature, are absolutely immune from suit under § 1983.)

▪ Legislative immunity not only protects state legislators from civil liability, it also functions as an evidentiary and testimonial privilege.[12] In *Dombrowski v.*

---

**11.** *Tenney* involved a suit brought by private litigants alleging constitutional torts pursuant to 42 U.S.C. §§ 1983 and 1985.

**12.** The NAACP plaintiffs argued both in their papers and during the discovery hearing that the doctrine of legislative immunity does not bar discovery of legislators in a case brought pursuant to Section 2 of the Voting Rights Act. (NAACP Pls.' Memo. in Opposition to Defs.' Proposed Restrictions upon Discovery, at 9–10). In support of their contention, the NAACP plaintiffs relied upon language in *Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Specifically, plaintiffs emphasized the following passage: "In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege." *Id.* at 268, 97 S.Ct. at 565. Citing *South Carolina Educ. Ass'n v. Campbell,* 883 F.2d 1251, 1259 (4th Cir.1989), *cert. denied,* 493 U.S. 1077, 110 S.Ct. 1129, 107 L.Ed.2d 1035 (1990) the plaintiffs claimed that the "extraordinary instances" described by the *Arlington Heights* court included an inquiry into the motive behind alleged violations of Section 2 of the Voting Rights Act.

The plaintiffs appear to have confused legislative immunity with an inquiry into legislative motive. Since *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 130–31, 3 L.Ed. 162 (1810), the general rule has been that inquiry into the motives of legislators was not in keeping with our scheme of government and, therefore, "placing a decisionmaker on the stand is usually to be avoided." *Arlington Heights,* 429 U.S. at 268 n. 18, 97 S.Ct. at 565 n. 18 (citations omitted). Plaintiffs are correct in asserting that there are exceptions to this general rule, for example in race and sex discrimination cases. *Campbell,* 883 F.2d at 1259; *United States v. O'Brien,* 391 U.S. 367, 383–84, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968). While subsequent to the Supreme Court's decision in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), proof of legislative motive is no longer one of the three required elements for proving a Section 2 violation, proof of motive nevertheless may be relevant. Additionally, legislative motive remains an element of the MFFR plaintiffs' political gerrymandering claim and is certainly relevant to that claim. *See Davis v. Bandemer,* 478 U.S. 109, 127, 106 S.Ct. 2797, 2807, 92 L.Ed.2d 85 (1986).

Plaintiffs cannot, however, inquire into legislative motive if such an inquiry would necessi-

*Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967), the Court acknowledged that, to effectuate the purposes of the doctrine of legislative immunity, legislators "should be protected not only from the consequences of litigation's results but also from the burden of defending themselves." Thus, a state legislator acting "within the sphere of legitimate legislative activity" may not be a party to a civil suit concerning those activities, nor may he be required to testify regarding those same actions. *See Schlitz v. Commonwealth of Virginia,* 854 F.2d 43, 46 (4th Cir.1988) ("[t]he purpose of the doctrine is to prevent legislators from having to testify regarding matters of legislative conduct, whether or not they are testifying to defend themselves."). The privilege is a personal one and may be waived or asserted by each individual legislator.

■ The doctrine of legislative immunity is also applicable to legislative staff members, officers, or other employees of a legislative body, although it is considered "less absolute" as applied to these individuals. *Dombrowski,* 387 U.S. at 85, 87 S.Ct. at 1427; *Tenney,* 341 U.S. at 378, 71 S.Ct. at 789. ("Legislative privilege [when asserted by a legislator] ... deserves greater respect than where an official acting on behalf of the legislature is sued or the legislature seeks the affirmative aid of the courts to assert a privilege.") The immunity enjoyed by legislative staff derives from the individual legislators themselves: to the extent a legislator is immunized, his staffers are likewise "cloaked." *See Gravel v. United States,* 408 U.S. 606, 618, 92 S.Ct. 2614, 2623, 33 L.Ed.2d 583, *rehg. denied,* 409 U.S. 902, 93 S.Ct. 98, 34 L.Ed.2d 165 (1972). ("[T]he Speech and Debate Clause applies not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself.")[13]

■ It is the *function* of the government official that determines whether or not he is entitled to legislative immunity, not his title. In *Forrester v. White,* 484 U.S. 219, 223–24, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1987), the Supreme Court acknowledged the "functional" approach under which it had decided prior immunity cases. That approach involves an examination of the "nature of the functions with which a particular official or class of officials has been lawfully entrusted" as well as "the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Forrester,* 484 U.S. at 224, 108 S.Ct. at 542.[14] Thus, much more important than

---

tate an abrogation of legislative immunity. Contrary to plaintiffs' assertions, the immunity enjoyed by state legislators is *absolute.* Where an inquiry into legislative motive "would require legislators to testify regarding conduct in their legislative capacity, the doctrine of legislative immunity has full force." *Schlitz v. Commonwealth of Virginia,* 854 F.2d 43, 45 (4th Cir.1988) (because the Commonwealth would have been unable to defend itself unless the legislators testified as to their motives for declining to reelect former state judge plaintiff, the doctrine of legislative immunity barred the suit). *See also Hollyday v. Rainey,* 964 F.2d 1441, 1443 (4th Cir.1992). Thus, legislative immunity, if found, *would* bar inquiry into legislative motive regarding alleged Section 2 violations, just as it would prohibit certain discovery regarding plaintiffs' other claims.

**13.** The purpose of the extension of this immunity beyond the legislators themselves was cogently articulated by the *Gravel* court:

> [F]or the purpose of construing the privilege a Member and his aide are to be 'treated as one,'.... [I]t is literally impossible ... for Members of Congress to perform their legislative tasks without the help of aides and assistants; ... the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos; and that if they are not so recognized, the central role of the Speech or Debate Clause ... will inevitably be diminished and frustrated.

408 U.S. at 617, 92 S.Ct. at 2623 (citations omitted). While the *Gravel* court's discussion is concerned with the staff of United States Representatives and Senators, modern state legislatures operate in a similar fashion and are equally dependent upon skilled legislative aides.

**14.** *See also Baker v. Mayor and City Council of Baltimore,* 894 F.2d 679, 682 (4th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990). In determining that the Board of Estimates of Baltimore (composed of the Mayor, Comptroller, President of the City Council, City Solicitor, and Director of Public Works) was entitled to legislative immunity, the *Baker* court reasoned that the "function performed by

the branch to which an official is assigned is his particular role in a given governmental activity and whether the absence of immunity would have a "chilling effect" upon the official's performance of his duties.

 Under this analysis, it is clear that legislative immunity is not confined to the legislative branch; rather, the judiciary can act in a legislative capacity, *see Supreme Court of Virginia v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 734, 100 S.Ct. 1967, 1975, 64 L.Ed.2d 641 (1980) (Virginia Court exercised State's entire legislative power with respect to regulating the Bar and issuing Bar Code and was immune from suit when acting in legislative capacity), as can the members of the executive branch. *Fralin & Waldron, Inc. v. County of Henrico, Va.*, 474 F.Supp. 1315, 1320 (E.D.Va.1979). *See generally Butz v. Economou*, 438 U.S. 478, 511, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978) (rejecting argument that absolute immunity should be denied to individuals employed in the Executive Branch, reasoning that "[j]udges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities.") [15]

 Analyzing *Forrester's* "functional" approach, the grant of legislative immunity appears to be dependent upon the confluence of three separate elements: (1) the actor, who must be a government official or an individual working on his behalf; (2) the act itself, which must fall within the "sphere of legitimate legislative activity;" and (3) the act's proximity to the legislative arena. If, for example, a legislator made a speech on the floor of the legislature, she would be protected from suit as to the contents of that speech. Legislative immunity exists because each of the three factors listed above is present. In contrast, if that legislator gave that same speech in her home district, she would not be protected from a potential suit for slander. While the actor (element one) and the act (element two) are the same, the policy rationales for protecting the speech are absent because it is not given within sufficient proximity to the legislative arena (element three). On the confluence of these three factors depends the immunity.

## THE MARYLAND LEGISLATURE

 Based upon the doctrine as outlined above, we must now determine whether actions taken by the members of the Maryland Legislature concerning the Governor's redistricting plan warrant legislative immunity. It is evident that any action (or inaction) taken by the Maryland Legislature after the Governor's plan was introduced on January 8, 1992 falls within the scope of legislative immunity. Without question, both the House of Delegates and the Maryland Senate were acting "within the sphere of legitimate legislative activity" in failing to enact an alternative redistricting plan and thus allowing the Governor's Plan to become law. The legislators were meeting in regular session to consider the passage or rejection of proposed legislation for the purpose of enacting law. Such activity is quintessentially legislative, and legislators so engaged deserve all of the protection the *Tenney* court extended to them. Thus, *any* inquiry into the Maryland Legislature's consideration of the Governor's Plan or its failure to ratify an alternative plan is entirely barred. Of course, legislative immunity is personal and belongs to the individual members of the Maryland Legislature themselves. The privilege may be asserted or waived as each individual legislator so chooses.[16]

the Board [in submitting a proposed budget to the City Council for passage], and not the titles of its members, is determinative of whether a given task is legislative or executive in nature for immunity purposes."

**15.** In *Lake County Estates, supra*, 440 U.S. at 405 n. 30, 99 S.Ct. at 1179 n. 30, the Court seemed to extend the "function not title" analysis of *Butz* to imply that members of the legislative branch

can act in an executive capacity. *See also Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir.1988).

**16.** Thus, plaintiffs are free to notice for deposition individual state legislators and to require each of those persons to assert the privilege on his own behalf. Even if, however, the plaintiffs are successful in obtaining information or testimony from individual legislators concerning the process of legislative redistricting, it is question-

## THE GOVERNOR'S ADVISORY COMMITTEE

■ The analysis with respect to the Governor's Committee is more complex. As noted previously, the Committee was made up of three private citizens, one of whom functioned as the Committee chairman, as well as Senate President Miller and House Speaker Mitchell. None of the Committee members was under any statutory or constitutional duty to serve upon the Committee; all were appointed by Governor Schaefer pursuant to the executive power vested in him by the Maryland Constitution, and each served at his pleasure. Thus, the members of the Committee were acting, under a "title" analysis, as an executive committee, and President Miller and Speaker Mitchell, although legislators when performing legislative duties, would not enjoy the privilege of legislative immunity as such.[17]

## THE GOVERNOR AND DERIVATIVE IMMUNITY

That the Committee was executive by "title," however, is only the beginning of the immunity analysis. The central question is *how* the Governor functioned, and whether that function entitles the members of the Committee to derivative legislative immunity.

The stated purpose of the Committee was to "make recommendations to the Governor and General Assembly on boundary changes for legislative and Congressional election districts" reflecting population shifts as recorded in the 1990 census. *1991–92 Maryland Manual,* at 486. Nothing in the parties' papers or the arguments of counsel in this case indicates to this Court that the Committee in reality operated differently than it had been envisioned. Indeed, the Committee clearly provided substantial assistance to the Governor in the preparation of both legislative and Congressional redistricting plans for Maryland. The culmination of their efforts was the plan presented to the Governor in December, 1991, which, with only minor changes, he ultimately introduced to the Legislature.

■ Our next inquiry, then, is whether the actions of the Governor himself were "within the sphere of legitimate legislative activity," *see Forrester, supra,* such that he functioned as a legislator, and thus should be cloaked in legislative immunity. Determination of what tasks are "within the legislative sphere" is not easy. While the caselaw is replete with examples of when legislative immunity has been granted or withheld, little guidance is provided regarding how to determine what constitutes a legitimate legislative activity.

Courts have, however, provided some anecdotal examples of legislative functions. In *Gravel,* 408 U.S. at 617, 92 S.Ct. at 2623, the Court noted that the legislative sphere included: "[c]ommittee reports, resolutions, and the act of voting ...; '[i]n short, ... things generally done in a session of the House by one of its members in relation to the business before it." *quoting Kilbourn v. Thompson,* 103 U.S. 168, 204, 26 L.Ed. 377 (1881). The Eleventh Circuit in *Crymes v. DeKalb County, Georgia,* 923 F.2d 1482, 1485 (11th Cir.1991) concluded that "a legislative act involves policy-making rather than mere administrative application of existing policies." *See also Rateree v. Rockett,* 852 F.2d 946, 950 (7th Cir.1988) ("budgetmaking is a quintessential legislative function").

It is axiomatic that to this list must be added the preparation and introduction of legislation for the legislature, in this case the General Assembly of Maryland, to consider and accept or reject. *See Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627. Indeed, it is difficult to imagine something which is

---

able how much assistance such information might provide in establishing plaintiffs' *prima facie* case. *See Campbell,* 883 F.2d at 1262 ("[i]t is axiomatic that if motivation is pertinent, it is the motivation of the entire legislature, not the motivation of a handful of voluble members, that is relevant").

**17.** That President Miller and Speaker Mitchell may have used their legislative expertise in preparing the Plan or that they may have been appointed because of their leadership positions within the Maryland Legislature is not dispositive of the *function* they performed as members of the Governor's Advisory Committee.

more at the core of legislative activity than the introduction of legislation. When viewed in this light, the actions of the Governor seem clearly to fall within the purview of "legitimate legislative activity." After appointing a committee to aid him in the preparation of legislation, he reviewed their report, made changes where he thought appropriate, and submitted the legislation to the General Assembly for the purpose of gaining passage of the plan into law. Thus although the Governor's title indicates his Executive position within the governmental framework of the State, his specific actions in this case indicate that he functioned as would a legislator, and therefore the Governor is entitled to legislative immunity for his actions in preparing and presenting the legislative redistricting plan to the General Assembly.[18] Of course, the *sui generis* nature of redistricting legislation distinguishes the Governor's role here from the executive role, in more pedestrian cases, of proposing legislation to be introduced—or not—by individual members.

 Once the Governor's immunity has been established, the question then becomes whether the members of the Committee should derive complete immunity from the Governor, or whether they are only entitled to some lesser form of immunity. Although *Tenney* and *Dombrowski*

indicate that this privilege might be less absolute than that of the Governor, *Gravel, infra,* leaves the undersigned in no doubt that the correct result is to treat the members of the Committee as the Governor's "alter egos" and thus grant them full immunity both from liability and inquiry as to their actions while preparing the plan for the Governor's consideration.[19] The policy reasons that inspired the Court to create the doctrine of legislative immunity in *Tenney* are no less valid when applied to the members of the Committee than they would be when applied to legislators themselves. As noted above, the efficient functioning of contemporary government relies on the existence of staff members who perform tasks traditionally assigned to the legislators themselves. If these staff members (here, non-legislator committee members) are not accorded the same testimonial and liability immunity as the legislators, then the purpose of *Tenney* would be vitiated.

 An order will be issued separately *granting* the defendant's Motion to Dismiss Defendants Miller and Mitchell, in that they have no personal liability to plaintiffs. Of course, they still might have relevant information to be obtained in discovery if and when the majority of this Court decides to allow them to be deposed as to

---

**18.** The plaintiffs might seek solace in the fact that the Maryland Constitution requires the Governor to act in this legislative role, and that therefore there is something inherently desirable in having the Executive prepare this legislation. They could point to the fact that no legislator *can* introduce legislation pertaining to legislative redistricting, at least until the Governor has introduced his own. Thus the Governor, plaintiffs might contend, even though appearing to act as a legislator, is acting in a way no legislator is permitted to act and therefore cannot be performing a legitimate legislative activity. In fact, under this analysis, the Governor would merely be fulfilling his Constitutionally mandated role in the process, and would thus be acting in his traditional Executive capacity.

This analysis is, however, flawed by its reliance on the specific nature of the Governor's role in State Government. The Governor, it is true, has vested in him the Executive power of the State of Maryland. The "functional" test of *Forrester,* however, looks to the nature of the functions entrusted to an official or officials, and the effect of liability on those functions, not

to the power with which that specific official or officials is invested. It is, therefore, the legislative *nature* of the Governor's actions which concerns us, and not the fact that it is the Governor who is required to act. Thus, even though a legislator could not introduce the *specific* legislation which is the subject matter of this lawsuit, it is in the nature of the function entrusted to a legislator to introduce legislation. The nature of the Governor's actions was, therefore, legislative, and thus they should be cloaked in legislative immunity.

**19.** Judges Murnaghan and Motz disagree on this point, however, and are of the opinion that legislative privilege does not extend to the three private citizen members of the Committee, thus leaving them uncloaked from providing testimony. Further, they defer any ruling on whether defendants Miller and Mitchell, in their capacity as members of the Advisory Committee, should be able to assert legislative immunity. This is the subject of their separate opinion, which reflects their majority, and thus prevailing, views on this point.

their actions as members of the Governor's Committee. Although a ruling on whether legislative privilege may be affirmatively asserted by Miller and Mitchell as to any actions taken by them as members of the Governor's Committee is deferred under the prevailing opinion of Judges Murnaghan and Motz, there is no question that they may assert the privilege as to any action taken by them after the redistricting legislation reached the floor of the General Assembly.[20]

## IV. DISCOVERY OF DR. LICHTMAN

■ The defendants have opposed the plaintiffs' attempts to depose Dr. Allan J. Lichtman. Dr. Lichtman is a Professor at the American University, and was hired, according to the defendants, by the Maryland Attorney General's Office to advise them in the course of anticipated litigation stemming from the congressional redistricting plan promulgated by the Governor's Redistricting Advisory Committee. (Defs.' Response to Proposed Discovery, at 13.) The proposed plan was indeed challenged in Court, and was upheld in *Anne Arundel County Republican Cent. Comm. v. State Administrative Bd. of Election Laws*, 781 F.Supp. 394 (D.Md.

1991), *aff'd*, —— U.S. ——, 112 S.Ct. 2269, 119 L.Ed.2d 197 *rehg. denied*, —— U.S. ——, 112 S.Ct. 3058, 120 L.Ed.2d 923 (1992). The Governor's Committee, however, continued to meet and ultimately produced the legislative redistricting plan which is the subject of the present litigation. Dr. Lichtman continued to advise the Governor's committee, under the direction of the Maryland Attorney General's office.

The defendants contend that, because Dr. Lichtman was an expert retained in anticipation of litigation, he should be protected from discovery under Fed.R.Civ.P. 26(b)(4),[21] the attorney-client privilege, the work-product privilege and the deliberative and legislative process privileges. The plaintiffs take the position that there is a "strong inference" that Dr. Lichtman was a participant in the development of the plan itself, not merely an adviser as to the various implications of the plan and the anticipated legal challenges thereto. (NAACP Pls.' Proposed Schedule of Discovery, at 14.) Thus, they contend, Rule 26(b)(4) cannot be invoked to protect Dr. Lichtman from discovery, since he was an active participant in the events which are the subject matter of this litigation, not merely an adviser.

**20.** Legislative immunity is, as noted above, a personal immunity from liability as well as an evidentiary and testimonial privilege. It does not, however, extend to certain types of documentation. *See Corporacion*, 709 F.Supp. at 297. *See also In re Grand Jury Proceeding*, 563 F.2d 577 (3d Cir.1977); *United States v. Helstoski*, 576 F.2d 511 (3d Cir.), *cert. granted*, 439 U.S. 1045, 99 S.Ct. 719, 58 L.Ed.2d 704 (1978), *aff'd*, 442 U.S. 477, 99 S.Ct. 2432, 61 L.Ed.2d 12 *aff'd sub nom. Helstoski v. Meanor*, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979); *In re Grand Jury Investigation*, 587 F.2d 589 (3d Cir.1978); Fed.R.Evid. 501, offering a "speech or debate-like" privilege. Thus, the defendants will be required to produce any documents prepared by the Committee during the course of its deliberations which are requested by the plaintiffs, subject, of course, to the assertion of any other privilege on behalf of particular documents. The extent to which documents discovered by the plaintiffs may be used at trial, especially given this Court's dismissal of the two legislator-defendants from this case, is an issue which we need not address here.

**21.** The text of the rule, in pertinent part, is as follows:

Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

\* \* \* \* \* \*

(B) A party may discover facts known or .opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only ... upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

Furthermore, plaintiffs claim that the privileges asserted by the defendant are not applicable to Dr. Lichtman. The plaintiffs note that the attorney-client privilege is only applicable when an expert advises an attorney who then advises his client. Where a client consults an expert independently, then the privilege will not apply. Finally, the plaintiffs question the extent to which litigation was anticipated in this case. They note that the retention of an expert merely to ensure compliance with legal requirements, even where there is a likelihood of litigation, is not privileged under the work-product doctrine.

Certainly, if the plaintiffs are correct that Dr. Lichtman was an active participant in the events which form the subject matter of this litigation, they are entitled to whatever discovery of him they may deem appropriate. They are also entitled to discovery if they are correct that Dr. Lichtman was consulted by the committee independently of any supervision by the Attorney General's office, or that litigation was not truly anticipated in this case. However, if the defendants are correct, and Dr. Lichtman was neither an active participant in the preparation of the redistricting plan, nor independently consulted by the committee, and that litigation was anticipated at the time of his appointment, then the defendants are equally correct that Rule 26(b)(4) and the various privileges would bar any discovery of Dr. Lichtman.

The impasse to which these diametrically opposing positions have brought us can easily be resolved by a simple affidavit from Dr. Lichtman, addressing the various issues in dispute. If, after Dr. Lichtman has submitted his affidavit, it appears that he merely gave advice to the Committee, at the request of the Attorney General's office, concerning the legal implications of the plan under consideration by the Committee, then clearly he will be protected by Rule 26(b)(4) and the attorney-client privilege. Should this not be the case, the Court can then consider the question of whether or not the current litigation was sufficiently anticipated, thus resolving the question of the work-product privilege. Should it prove necessary, the Court can

also, at that time, consider the deliberative and legislative process privileges asserted by the defendants. Of course, should the defendants, at some later time, list Dr. Lichtman as a potential witness in this case, then the plaintiffs would have an undisputed right to depose him as they would any other trial witness.

## V. BIFURCATION

The defendants have also asked this Court to bifurcate discovery in this case. The gravamen of their argument is that the plaintiffs will be unable to satisfy one of the prongs of the test promulgated in *Davis v. Bandemer,* 478 U.S. 109, 127, 106 S.Ct. 2797, 2807, 92 L.Ed.2d 85 (1986). This test requires that a plaintiff attempting to show partisan gerrymandering must, with respect to an identifiable political group, show (1) intentional discrimination against that group and (2) an actual discriminatory effect on the group. It is this second prong of the test which, the defendants claim, will, for a variety of factors, be impossible for the plaintiffs to prove. Thus, they contend, this Court should require the plaintiffs to make a showing that a *prima facie* case can be made regarding the actual discriminatory effect of the plan before discovery can be had on the other issues in this case.

Implicit within the defendants' analysis of this issue is an assumption that the *Davis* test is weighted unevenly, with more emphasis falling on the second prong. In fact, the *Davis* test consists of two equal prongs, and nothing contained in *Davis* leads this Court to assume that only after an actual discriminatory effect is shown should a court review the intent which informed that discrimination. It may well be, as the defendants point out, that no partisan gerrymandering case has yet made a showing of actual discriminatory effect. This does not mean, however, that such a showing *cannot* be made, which is what the defendants appear to be asking the Court to hold. To subscribe to the defendants' logic on this point, however, would be tantamount to rendering *Davis* moot, and thus would insulate the legisla-

tive redistricting process from judicial review of claims of partisan gerrymandering. This the Court simply will not do. The plaintiffs may have embarked on a task of near Sisyphean proportions, but such was their decision when they chose to pursue this litigation. This Court will neither prejudge the plaintiffs' potential for success in this case, nor increase their burden by prescribing the order in which they should present their case.

Thus, discovery in this case will proceed normally for a period of ninety (90) days from the date of this opinion. The Court is confident that, at the close of discovery, the defendants will afford it the opportunity to evaluate the sufficiency of the plaintiffs' evidence by submission of a motion for summary judgment once discovery has been had on all of the issues in this case.

Based upon the above analysis, an Order will be entered separately:

(1) GRANTING NAACP plaintiffs' Motion to Consolidate;

(2) GRANTING defendants' Motion to Dismiss Defendants Miller and Mitchell;

(3) ORDERING defendants to submit an affidavit pursuant to the above discussion within fourteen (14) days of the date of the accompanying order; and

(4) DENYING defendants' request for bifurcated discovery.

MURNAGHAN, Circuit Judge, and MOTZ, District Judge.

We agree with almost all that Judge Smalkin has written in his thorough and scholarly opinion. We believe, however, that a less categorical, more flexible, approach should be taken to the question of testimonial legislative immunity in shaping the scope of discovery.

Legislative redistricting is a *sui generis* process. While it is an exercise of legislative power, it is not a routine exercise of that power. The enactment of statutes ordinarily involves the implementation of public policy by a duly constituted legislative body. Redistricting involves the establishment of the electoral structure by which the legislative body becomes duly constituted. Inevitably, it directly involves the self-interest of the legislators themselves.

The doctrine of legislative immunity (both in its substantive and testimonial aspects) [22] itself embodies fundamental public policy. It insulates legislators from liability for their official acts and shields them from judicial scrutiny into their deliberative processes. The doctrine is a bulwark in upholding the separation of powers. It does not, however, necessarily prohibit judicial inquiry into legislative motive where the challenged legislative action is alleged to have violated an overriding, free-standing public policy. The Supreme Court has recognized that "[i]n some extraordinary instances the members [of a legislative body] might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 268, 97 S.Ct. 555, 565, 50 L.Ed.2d 450 (1977); *see also South Carolina Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1259 (4th Cir.1989), *cert. denied*, 493 U.S. 1077, 110 S.Ct. 1129, 107 L.Ed.2d 1035 (1990) (recognizing that judicial inquiry into legislative motive is appropriate where "the very nature of the constitutional question requires an inquiry into legislative purpose," quoting from *United States v. O'Brien*, 391 U.S. 367, 383 n. 30, 88 S.Ct. 1673, 1682 n. 30, 20 L.Ed.2d 672 (1968), but not specifically holding that the inquiry may be made through legislators' testimony).

The unique nature of legislative redistricting and the fact that testimonial legislative immunity is not an absolute leads us to conclude that we should permit the three members of the Governor's Redistricting

---

**22.** It is not necessary to explore the scope of legislative immunity under the provisions of the Maryland Constitution, Article III, Section 18 and the Declaration of Rights, Article 10. That can be left for another day since the common law casts its net on the scope of legislative immunity at least as widely as does the Maryland Constitution.

Advisory Committee who are private citizens to be deposed concerning the Committee's deliberations. However theoretically pure extension of the legislative immunity doctrine to them under a functional analysis test may be, as a practical matter inquiry through them into the factors which were taken into account by the Committee in formulating its redistricting plan would provide a means for learning pertinent information without directly impacting upon legislative sovereignty.[23] Likewise, we believe that ruling on the issue of whether Thomas V. "Mike" Miller, Jr., and R. Clayton Mitchell, Jr., can be deposed in their capacity as members of the Redistricting Advisory Committee should be deferred until a more complete factual record has been developed (by the depositions of the private citizen members of the Committee and otherwise). We too, however, would flatly prohibit their depositions from being taken as to any action which they took after the redistricting legislation reached the floor of the General Assembly as President of the Senate and Speaker of the House, respectively (unless they ultimately are listed by the Defendants as trial witnesses) because of the direct intrusion of such discovery into the legislative process.

A legitimate argument can perhaps be made that considerations of federalism and the separation of powers should have persuaded the Supreme Court and the Congress never to confer jurisdiction upon the federal courts to review state legislative redistricting plans in the first place. However, that jurisdiction has been created, and we should not *de facto* abdicate our responsibility to exercise it. The promise having been made, we must provide an opportunity for its fulfillment. We should not simply rely upon bright line tests which have been developed in other contexts to bar virtually all discovery of relevant facts. Rather, we must accept the task, however distasteful and arduous it may be, of closely monitoring the discovery process and be prepared to revisit the testimonial issues now presented if, after having conducted limited preliminary discovery, plaintiffs are able factually to draw into serious question the legality of the redistricting under federal law.

---

**23.** We might also note that we deem it extremely unlikely that in the future private citizens would refuse to serve on a prestigious gubernatorial committee because of a concern that they might subsequently be deposed in connection with actions taken by the committee.