OPINION OF THE COURT
Chief Judge Wachtler.
The primary question on this appeal is whether the Minor *43 ity Leader of the State Senate may be prosecuted criminally for having assigned employees of his Senate staff, largely during the year 1986, to work on political campaigns for members of his party seeking election or reelection to the Senate. The case also presents the question whether defendants may be prosecuted criminally for having placed on the Senate payroll, during that same period, "no-show” employees —persons who did no work and were not expected to do anything to earn their salaries.
The trial court dismissed hundreds of counts relating to the use of Senate staff employees in political campaigns, and the Appellate Division precluded the prosecutor from proceeding on the remaining counts in that category. However, both courts sustained the counts relating to the "no-show” employees. The prosecutor and the defendants have cross-appealed. We now affirm, emphasizing that we are not dealing here with a civil action to enjoin the expenditure of funds or to recover funds already expended. Nor do we condone the challenged expenditures. Our focus is solely on whether defendants’ acts subjected them to criminal prosecution under the circumstances of this case.
I. The Facts
The facts are thoroughly set forth in the opinions of the courts below and need only be summarized briefly here.
The defendant Manfred Ohrenstein is a Democratic Senator and the Minority Leader of the State Senate. The indictment alleges that in 1986 he conspired with his chief of staff, defendant Francis Sanzillo, and Senator Howard Babbush to use Senate employees from their staffs in seven campaigns for the Senate in which the incumbents were considered vulnerable. In two of the campaigns Democratic Senators were seeking reelection; in the others Democratic candidates challenged Republican incumbents.
Defendant Joseph Montalto, who was attempting to regain his Senate seat, was allegedly one of the beneficiaries of this plan and actively sought the assistance. Senator Babbush allegedly contributed one campaign worker from his staff, but most of the employees involved were supplied by Senator Ohrenstein from his staff or commissions containing his appointees. The trial court found that these employees fell into three categories. Some were regular legislative aides who were *44 temporarily assigned to work on the campaigns (Category 1). Others were hired for the campaigns and retained afterwards (Category 2) or let go when the campaigns were over (Category 3). These employees received regular salaries biweekly from the Senate payroll. In each instance the Senator or his designee certified that the employee was on the Senate staff and had performed “proper duties” during the relevant period. If the campaign efforts had been wholly successful, it is likely that the Democrats would have obtained a majority in the Senate and that Senator Ohrenstein would have become the Majority Leader. But the efforts did not succeed entirely; in all seven of the targeted campaigns the incumbents, including the two Democratic incumbents, were reelected.
In 1988, the defendants and others were indicted by a Manhattan Grand Jury. The indictment contains 665 counts charging the defendants, individually or in various combinations, with felonies and misdemeanors generally related to theft allegedly committed between 1981 and 1986. The bulk of the charges concern the use of Senate staff in political campaigns and most of these charges relate to the 1986 election. The defendants were also charged with placing four persons on the payroll who performed no services of any kind. It is alleged that the defendants knew that these employees did nothing and, in fact, had no duties but that the Senators or their designees nevertheless certified that the employees had performed "proper duties.”
The defendants moved to dismiss the entire indictment on a variety of grounds. They argued that Senators and Senate employees may legitimately engage in political activities and that no statute, rule or regulation declared it an improper practice or a crime for a Senator to use staff members in political campaigns. Alternatively, they contended that they were denied due process because the law did not provide fair notice that the acts were prohibited. They claimed legislative immunity under the Speech or Debate Clause of the State Constitution, and further urged that the attempt by the prosecutor to define or limit the proper duties of legislative assistants constituted an unconstitutional intrusion by the executive branch of government into the Legislature’s affairs in violation of the separation of powers doctrine. They also contended that there were defects in the Grand Jury proceeding and asserted other grounds for dismissal.
The trial court granted the motion in part. The court *45 dismissed all those counts relating to Senate employees who participated in political campaigns but who also performed other assignments while on the Senate payroll (Categories 1 and 2). The court held that prosecution of these counts was prohibited by the separation of powers doctrine and the legislative immunity provided by the State Constitution. But the court denied the motion with respect to those counts alleging that certain Senate aides worked exclusively on political campaigns (Category 3), as well as those counts relating to the "no-show” employees.
The prosecutor appealed to the Appellate Division with respect to the dismissed counts. The defendants applied to the Appellate Division to prohibit trial of the counts which had not been dismissed, claiming primarily that the indictment constituted an unwarranted intrusion by the executive into legislative affairs and that legislative immunity was applicable.
The Appellate Division affirmed on the prosecutor’s appeal. On the defendants’ prohibition application the court concluded that prosecution of the remaining counts relating to the campaign workers (Category 3) was also precluded by separation of powers concerns and legislative immunity. The court additionally found that the law did not give the defendants fair warning that this was criminally prohibited as is required by due process. Finally, the Appellate Division agreed with the trial court that the prosecution could proceed on the counts relating to the "no-show” employees. As noted, both sides have appealed to our Court.
II. The Campaign Worker Counts
On the prosecutor’s appeal to our Court, it is urged that all counts relating to use of staff employees by these defendants for campaign work should be restored and that there is no constitutional impediment to prosecution. However, there is a threshold question as to whether the acts alleged were subject to criminal prosecution. We have concluded that they were not and therefore find it unnecessary to reach the constitutional questions with respect to these counts.
The indictment charges the defendants with violating various generic sections of the Penal Law dealing with theft, but all of the charges relating to the campaign workers rest on a single prosecutorial premise: political campaign activities were not a "proper duty” of a legislative staff member. Based on *46 this premise the defendants are charged with filing false instruments (Penal Law § 175.35) for certifying that members of the staff active in political campaigns performed "proper duties,” and are further charged with committing larceny by false pretenses (Penal Law former §§ 155.35, 155.40) for inducing the State to pay the salaries in reliance on the allegedly false statements. The defendants are also charged with theft of services (Penal Law § 165.15 [9]) on the theory that legislative employees assigned to campaign work have been diverted from their "proper duties”. Counts charging the defendants with engaging in a conspiracy (Penal Law § 105.05) and a scheme to defraud the government (Penal Law § 195.20) rest on the same premise.
It is important to emphasize that we are not dealing here with broad policy and ethics questions concerning the propriety of permitting State employees generally to participate in political campaign activities. This case focuses narrowly on alleged criminal activities of legislative employees who are unique in several respects because of the nature of the Legislature’s function.
Under the State Constitution, the Legislature alone has the power to authorize expenditures from the State treasury, and to "regulate and fix the wages or salaries and the hours of work or labor * * * of persons employed by the state” (NY Const, art XIII, § 14). The Legislative Law delegates to the Minority Leader the power to "appoint such employees to assist him in the performance of his duties as may be authorized and provided for in the legislative appropriation bill” (§ 6 [2]) and to determine their tenure (§ 8) and salaries (§ 10). Similar powers are delegated with respect to committees (§ 9). However, there is no statute fixing the hours of work for such employees or defining the duties of legislative aides or the duties of the Minority Leader they are hired to assist. And at the times relevant here, there was no rule or regulation concerning these matters. The Legislature is not always in session, and when it is in session, legislators and their staffs often work late into the night and through holidays and weekends until the Legislature’s work is done. They were not required to account for their time and received no additional compensation or formal compensatory time allowances for overtime. Legislative staff members worked when they were needed and were often given free time when they were not needed, at the discretion of the particular legislator.
*47 The appropriation bill that authorized the salaries in this case limited the amount of money available but did not otherwise limit the legislator’s powers with respect to the allocation of staff time or function. It provided simply that the funds were to be used for “personal service of employees and for temporary and expert services of legislative and program operations * * * [and] of standing committees.”
Thus the statutes permitted the individual legislator to appoint staff members, to determine the terms and conditions of their employment and to assign duties and the hours of work as the legislator deemed necessary to fulfill the broad range of legislative duties. Despite this extensive grant of authority, the prosecutor urges that a Senator’s power to assign duties to legislative assistants should be limited to governmental activities and should not include purely political ones. Although this distinction may be relevant to other State employees, the line between political and governmental activities is not so easily drawn in cases dealing with legislators and their assistants.
The Legislature is the “political” branch of government. All of its members are elected every two years and all legislation is the product of political activity both inside and outside the Legislature. Indeed, by statute the State Legislature itself is structured along party lines with the majority and minority parties in both houses organized behind elected party leaders. As noted, the Minority Leader is expressly authorized to appoint persons to assist him with his duties, and annual appropriations specifically authorize the expenditure of State funds to compensate these employees and enable the party leaders to carry out that party’s “program operations.” In addition to political activities formally recognized at law, there are additional functions which a legislator performs to gain support in the community, such as distributing newsletters and meeting constituents. Although these activities may be fairly characterized as political, as opposed to governmental, they are considered an inherent part of the job of an elected representative and thus perfectly legitimate acts for a legislator or legislative assistant to perform (Hutchinson v Proxmire, 443 US 111). Indeed, the prosecutor does not suggest that every legislator who uses State facilities or personnel for any type of political activity should be indicted for misuse of government funds. As the People make clear in their reply brief, for example: “The People recognize that some ‘political’ *48 activities of legislators and their aides do fall into an uncertain or 'gray’ area.” Conduct is not illegal "merely because legislative employees worked on election campaigns.” It has "never been [the People’s] position that legislative employees are prohibited from engaging in political campaign activity.” Thus the prosecutor’s objection to the defendants’ use of Senate staff for the campaigns is not based on the fact that it is a political activity but on the belief that it is too political.
The question for us to decide is not whether the defendants’ conduct would be permitted today or should be allowed in the future. Our only concern is whether the defendants’ conduct was prohibited, so as to subject them to criminal prosecution, when they engaged in these activities during and prior to 1986. Although prior to 1987 some felt that the use of staff employees in political campaigns should be prohibited or subject to limitations, it is apparent that for many years that was not the prevailing view.
In 1945, a Joint Legislative Committee recommended that legislative staff employees not be included with other State employees in the Civil Service system. The study notes that: "Under our theory of government where party programs have been the basis for legislation, it might hamstring a legislator to surround him with employees unsympathetic to his point of view or to whom party strategy cannot be confided * * * [furthermore] civil service employees would not be free to participate in the political activity generally required of a legislator” (Interim Report of NY St Joint Legis Comm on Legis Methods, Practices, Procedures and Expenditures, 1945 NY Legis Doc No. 35, at 31, 32). In subsequent years, as the Appellate Division noted, critics and concerned legislators recommended curtailing the practice or suggested imposing restrictions or "guidelines” regulating the use of legislative staff members in political campaigns (153 AD2d 342, 362-363). But it was not until 1987 that the Legislature placed any restrictions on the practice.
In that year the Legislature created a commission to study the subject and adopted interim guidelines reaffirming the right of legislative employees to participate in political campaigns, provided that did not interfere with legislative duties, which for the first time was defined to include specified activities excluding political campaigns (Concurrent Resolution No. 812). Later in the year Governor Cuomo signed the Ethics in Government Act, establishing a Legislative Ethics *49 Committee to review such matters (L 1987, ch 813) and adopted the New York State Governmental Accountability, Audit and Internal Control Act of 1987 (L 1987, ch 814), which required the Senate to adopt procedures regulating its personnel and their salaries.
Thus prior to 1987, when the activities at issue here occurred, the Legislature was aware of the fact that its members were using staff employees in political campaigns perhaps excessively, and nevertheless chose to place no restrictions on the practice. Although it is arguable that the defendants’ conduct might have exceeded the custom in some respects, the controlling factor for the purposes of a criminal prosecution is that there was no law which, either expressly or as interpreted by the courts, declared the acts to be criminal. Moreover, it cannot fairly be said that the Legislature otherwise forbade the conduct so that it could serve as a predicate for a conviction under general Penal Law provisions.
The prosecutor urges that the matter does not end here. He contends that the defendants’ conduct is prohibited by article VII, § 8 of the State Constitution, which prohibits the use of State moneys for "private undertaking[s]” and which has been construed by some authorities to include partisan causes (see, e.g., Stern v Kramarsky, 84 Misc 2d 447). In other words, the prosecutor’s position is that if prior to 1987 the Legislature did not actually prohibit the defendants’ use of Senate staff in political campaigns, it nevertheless must be deemed to have done so because the Constitution would not permit the Legislature to expend State moneys in this manner or authorize others to do so.
The cases on which the prosecutor relies deal with State agencies which sought to use agency facilities and personnel to advance a partisan point of view (Stern v Kramarsky, supra; cf., Matter of Phillips v Maurer, 67 NY2d 672 [school board use of district facilities to advocate affirmative vote on proposition not permitted by Education Law]). They did not deal with legislative use of State resources for political activities, which even the prosecutor concedes is permissible to some extent. The prosecutor recognizes the need for a legislator or someone in the legislator’s office to respond to constituent inquiries, as well as the need to have staff members take some part in a legislator’s reelection campaign which may incidentally involve some use of State facilities. He argues, however, that exclusive or extensive use of legislative personnel for election *50 campaigns is prohibited by the Constitution, although he concedes that this provision would not preclude the Legislature from authorizing public funding for political campaigns but urges that it would have to be done impartially to avoid being treated as a "private undertaking.”
These arguments are far removed from the type of analysis appropriate to a criminal prosecution and need not be resolved here. Notably, although this provision has been a part of the State Constitution for well over a century, and the courts have frequently been called upon to construe it, this is the first time that it has been suggested that a violation, if it be that, should serve as a predicate for criminal prosecution.* A review of the section and its history shows that it was never intended to be used in this manner.
The section was added to the State Constitution in 1846 and, as originally adopted, it simply prohibited the State from giving or lending its credit to private enterprises. This was intended to curtail "the practice of subsidizing internal transportation improvements,” such as canals and railroads, which in the early part of the 19th century "seemed very much in the public interest” but which produced a fiscal crisis for the State government when these companies failed during the Depression of 1837-1842 (Wein v State of New York, 39 NY2d 136, 143). Although this prohibited the State from issuing bonds to finance such enterprises, it did not prohibit the giving or loaning of State moneys for such purposes. Because this practice was " 'liable to the same abuses’ ” (People v Westchester County Natl. Bank, 231 NY 465, 474), the Constitution was amended in 1874 to provide: "Neither the credit nor the money of the State shall be given or loaned to or in aid of any association, corporation or private undertaking” (former art VIII, § 9). In 1938, at the close of the Great Depression during which many municipal governments had *51 turned to the State for financial backing, the Constitution was again amended to prohibit the lending or giving of the State’s credit to public corporations as well as private ones (see, Wein v State of New York, supra).
We have noted that the purpose of all of these efforts was "to prevent improvidence * * * [in order] to safeguard the credit of the state” (People v Westchester County Natl. Bank, supra, at 474); the section was not aimed at preventing or punishing larceny. Many of the acts declared improvident are arguably in the public interest and beneficent or at least not the kind of conduct generally considered criminal (see, e.g., People v Westchester County Natl. Bank, supra [declaring invalid bonds used to raise money to pay bonuses for veterans of World War I]; Fox v Mohawk & Hudson Riv. Humane Socy., 165 NY 517 [use of license fees by humane society unconstitutional]; Farrington v State of New York, 248 NY 112 [private bill compensating employee for wrongful discharge invalid]). The primary goal of the section is to prevent or invalidate legislation which is fiscally unwise and, therefore, most of the "violators” will be legislators or citizens who vote for such propositions (see, e.g., People v Westchester County Natl. Bank, supra [bond proposition approved by voters]).
Obviously there was no intent to indict those who vote for a bill which violates the constitutional prohibition or to have that act serve as a predicate for an attempted larceny prosecution. Similarly, those who spend money consistent with an appropriation should not be held criminally responsible if the expenditure is later found to violate this section of the Constitution. The constitutional prohibition limits the power of the Legislature to appropriate, but it does not create a hidden limitation in every appropriation so that any expenditure which is facially valid, but constitutionally prohibited, can be deemed an unauthorized expenditure and therefore a predicate for a criminal prosecution. That would elevate and convert an ordinary fiscal responsibility measure into an extraordinary penal one and distort the purposes of the constitutional prohibition.
The dissent agrees that all the charges relating to the use of Senate staff in political campaigns should be dismissed, except those dealing with employees hired for the campaigns and released afterward (Category 3). Dismissal of those charges, the dissenter contends, will permit the Legislature to determine how State funds should be spent without any oversight *52 by the courts. However, it should be emphasized that in this case we have not been called upon to decide whether what occurred here should be civilly enjoined in the future or whether the money spent in the past may be recovered as an unauthorized expenditure of State funds. All we have before us is a criminal indictment and we hold only that the defendants cannot be held criminally liable for their use of Senate staff in these campaigns under the practice that existed prior to 1987.
Nor are we saying, as the dissent suggests, that such conduct would be permitted today or that it can continue in the future with impunity unless the Legislature adopts a statute specifically prohibiting it. The statutes dealing genetically with theft provide a basis for prosecution in cases where government employers use State employees for activities which are prohibited or are not within the employees’ duties as defined by statute, rule or regulation. The point we are making in this case is that at the time the defendants acted, their conduct was not prohibited in any manner; nor could they have known that they were subject to criminal prosecution for their acts; there was no statute, nor was there any rule or regulation defining the duties of legislative assistants or limiting the nature or extent of their permissible political activities. In a criminal prosecution where these defendants are charged with engaging in activities prohibited by law, the absence of any such legal prohibition is fatal to the prosecution.
Our holding is a narrow one based on circumstances which no longer exist. As indicated, the Legislature, acting as employer, has now adopted a joint resolution which defines some of the duties of legislative assistants and imposes limitations on a legislator’s use of such assistants. Additionally, the Legislature has adopted statutes requiring such staff members and their employers to make a more extensive account of their activities and has also created a panel to further study the matter and make additional recommendations. The joint resolution specifically addresses the dissenter’s concerns and prohibits legislators in the future from hiring staff assistants solely to work in political campaigns. We cannot decide future cases not before us; but in response to the dissent it is only fair to note that those who engage in such conduct in the future will not be able to make the arguments that we find determinative here in the event they are criminally prosecuted.
*53 III. The "No-Show” Counts
On the defendants’ appeal they urge that the Appellate Division erred in holding that prosecution of the counts relating to the "no-show” employees is not prohibited by the Speech or Debate Clause of the State Constitution or the separation of powers doctrine. We agree with the Appellate Division.
The theory underlying these coutits is that the defendants filed false instruments when they certified on the payroll records that these employees performed "proper duties,” and committed larceny when they induced the State to rely on the false statements. Here there is no question as to what "proper duties” include, because no matter how they are defined, they must at least include the performance of some services, of some type, at some time. Here it is alleged that these employees did nothing, that the defendants knew this and that the defendants also knew that they had no duties. These allegations are sufficient to sustain these criminal counts (Penal Law §§ 155.30, 155.35, 175.35).
This should also dispose of the defendants’ argument that the indictment and prosecution constitutes an unwarranted intrusion into the affairs of the Legislature in violation of the separation of powers concept because it will permit the executive and the courts to determine what are proper duties for legislative staff. No such inquiry is necessary in this case if, as alleged, these staff members did nothing and were not expected to perform any duties.
Finally, the defendants urge that the prosecution violates legislative immunity because it will permit inquiry into a legislator’s acts, particularly with respect to why a particular person was appointed to the staff and how the person performed.
The State Constitution provides: "For any speech or debate in either house of the legislature, the members shall not be questioned in any other place” (NY Const, art III, § 11). We have not previously considered the scope of the immunity granted by this section, but it appears that it was intended to provide at least as much protection as the immunity granted by the comparable provision of the Federal Constitution (New York State Constitutional Convention Committee, Problems Relating to Legislative Organization and Powers, at 57 [1938]). The Supreme Court has held that the Speech or Debate Clause confers immunity on members of Congress for legisla *54 tive acts but does not extend to everything a legislator does which is somehow related to his role even though the act is lawful and generally expected of a legislator (Hutchinson v Proxmire, supra).
Legislative acts have been defined as those which are an integral part of the legislative process, and have been held to include votes and speeches on the floor of the House as well as the underlying motivations for these activities (Hutchinson v Proxmire, supra; United States v Johnson, 383 US 169; United States v Brewster, 408 US 501). The immunity also extends to committee meetings and hearings which do not occur on the floor of the House and may be asserted by a legislator on behalf of staff members (Doe v McMillan, 412 US 306; Gravel v United States, 408 US 606). However, it does not extend to acts which a legislator performs to secure support in the community or to insure reelection, such as giving speeches in the community, issuing newsletters and press releases, or arranging for the publication of books (Hutchinson v Proxmire, supra; Gravel v United States, supra). In addition, no immunity attaches to an agreement to accept a bribe or the acceptance of an unlawful gratuity, even though the conduct relates to a vote or other legislative act which is entitled to immunity, so long as the prosecution is not based on the legislative act or the motives underlying it (United States v Brewster, supra). It also appears that the immunity may apply to some personnel decisions relating to the hiring and firing of certain employees of the Legislature but the scope of the immunity here is uncertain (Davis v Passman, 442 US 228).
Historically the Speech or Debate Clause serves to preserve the integrity of the Legislature by preventing other branches of government from interfering with legislators in the performance of their duties. But no matter how far the immunity may extend under the State Constitution, it cannot be said that it was intended to provide a sanctuary for legislators who would defraud the State by knowingly placing on its payroll employees who were never intended to do anything but receive State moneys. The defendants raise other issues with respect to the immunity doctrine, but they anticipate the type of proof which the prosecutor may seek to introduce at trial and should first be resolved there.
Accordingly, the order of the Appellate Division should be affirmed and the judgment of the Appellate Division should be affirmed, without costs.

 This case deals only with campaigning for individuals, but the prosecutor’s novel theory of criminality based on this section of the Constitution would have far-reaching implications in other contexts. It can be argued, as the dissent does here, that "[c]ampaigning, whether for a cause or a candidate, is a private activity” and that whenever public officials have "authorized payment of public funds for [such] private purposes * * * their conduct fell squarely within the scope of the [Penal Law] provisions proscribing larcenous acts.” (Dissenting opn, at 58, 63.) Under the broad rule proposed, any high public official who uses State informational services to urge the voters to adopt a proposition, such as a bond issue, would not only violate this section of the Constitution, as some lower courts have held, but would also be at risk of criminal prosecution.