Eric RODRIGUEZ, et al., Plaintiffs,

v.

George E. PATAKI, et al., Defendants.

Howard T. Allen, et al., Plaintiffs,

v.

George E. Pataki, et al., Defendants.

Nos. 02 Civ. 618(RMB)(FM),
02 Civ. 3239(RMB)(FM).

United States District Court,
S.D. New York.

July 28, 2003.

Gregory Charles Soumas, Gregory C. Soumas, New York City, for Eric Rodriguez, James R. Jubilee, Martin Malave-Divan.

Ira J. Lipton, Assist. corp. Counsel, Fredric S. Newman, Hoguet, Newman & Regal, LLP, New York City, for George E. Pataki.

Fredric S. Newman, Hoguet, Newman & Regal, LLP, New York City, Todd D. Valentine, Albany, NY, for Mary O' Donohue.

Eliot L. Spitzer, Joel Graber, Office of Atty. General of State of N.Y., for Eliot Spitzer, Charles Nesbitt.

Traci L. Lovitt, Jones Day, New York City, John Richard Braatz, New york City, Gregg M. Mashberg, Proskauer, Rose, LLP, New York City, for Joseph L. Bruno.

Nancy R. Sills, C. Daniel Chill, Graubard, Mollen, Horowitz, Pomeranz & Shapiro, New York City, for Sheldon Silver.

Brian J. Clark, Clifton, Budd & Demaria, LLP, New York City, for John J. Faso.

Arnold J. Ludwig, New York City, H. Reed Witherby, Boston, MA, for Martin E. Connor.

Todd D. Valentine, Albany, NY, for Crol Berman, Neil W. Kelleher, Evelyn J. Aquila.

Henry T. Berger, New York City, for Howard T. Allen, Jeannette Santos, Donald J. Jirak, Richard Flateau, Charlotte A. Taylor, Mervyn A. Campbell, Sarah Brockus.

Enry T. Berger, Center for Law and Social Justice Medger Evers College City Univ. of N.Y., Brooklyn, NY, for Sandra Rivers, Rosemari Mealy, Ronald Cranshaw, Sandra Bradford.

Gayle N. Wolkenberg, David J. Molton, Buchanan, Ingersoll, PC, New York City, for Raymond M. Fink, Stephen R. Gocinski, John Quaglione, Patricia Mustaro, Lena Yu.

Paul Wooten, Paul Wooten & Assoc., Brooklyn, NY, for New York State Council of Black Elected Democrats, Leslie Barbour, Michelle Romero, William O. Low, Cecilia Guiterrez, Evelyn Miller, Seretta C. McKnight, Tracey Edwards, Donna Swain.

Kenneth Kimerling, Glenn D. Magpanty, Asian Amer. Legal Defense and Educ. Fund, for Asian Amer. Legal Defense and Educ. Fund.

Todd D. Valentine, Albany, NY, for Neil W. Kelleher.

Foster Maer, Puerto Rican Defense & Educ. Fund, Inc., New York City, for Puerto Rican Legal Defense and Educ. Fund.

Gregory Charles Soumas, New york City, for James R. Jubilee, Martin, Malave-Divan.

Lawrence A. Mandelker, Kantor, Davidoff, Wolfe, Rabbino & Kass, New York City, for Robert A. Radulski, Bernard T. Kozykowski, Benjamin A. Gilman.

Nancy R. Sills, Graubard Miller, New York City, Cassandra Lentchner, Perkins, Cole, LLP, Washington, DC, for Anthony Creaney, Thomas Terry.

### OPINION AND ORDER

MAAS, United States Magistrate Judge.

#### I. Introduction

These consolidated actions (hereinafter, "action") challenging the New York Legislature's 2002 State Senate and Congressional redistricting plans are pending before Chief Circuit Judge Walker and District Judges Berman and Koeltl.[1] The three-judge court recently denied the defendants' motion to dismiss, concluding that any determination on the merits before the plaintiffs were afforded an opportunity to engage in discovery would be premature. See Rodriguez v. Pataki, 274 F.Supp.2d 363, 2003 WL 21782327 (S.D.N.Y.2003).[2] Because the issues raised in this action need to be resolved well in advance of the 2004 election, discovery has been placed on an accelerated schedule which calls for its

---

1. Pursuant to 28 U.S.C. § 2284(a), a three-judge court must be convened whenever "an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."

2. This order appears not to have been docketed and, consequently, is unavailable on Lexis or Westlaw.

completion by September 19, 2003. In addition, to facilitate that process, supervision of pretrial discovery has been referred to me.

I held an initial discovery conference on July 1, 2003. Thereafter, by letter-motion dated July 3, 2003 ("Pls.' Letter"), the plaintiffs and plaintiff-intervenors (collectively, "plaintiffs") moved to compel the production of "all documents relating to the analysis and process employed by [the d]efendants" in developing the 2002 Senate and Congressional redistricting plans, as well as responses to their interrogatories concerning these subjects. By letter dated July 11, 2003 ("Defs.' Letter"), defendant Joseph Bruno, Majority Leader of the New York State Senate, joined by defendant Sheldon Silver, Speaker of the New York State Assembly, opposed this motion on the basis of legislative immunity/privilege. On July 15, 2003, the plaintiffs submitted a reply letter-brief ("Pls.' Reply Letter").

On July 23, I held a telephone conference with lead counsel (Messrs. Richard D. Emery and Michael A. Carvin), during which I conveyed my conclusions regarding the defendants' claims of privilege. For reasons which are explained in further detail below, I advised counsel that the plaintiffs' motion to compel would be granted in part and denied in part. I further directed the parties to take certain steps to ensure that discovery will be completed by the September 19 deadline. Those directives were issued without prejudice to either side's right to file objections to my determination of the parties' privilege dispute within ten days after the issuance of this Opinion and Order.[3]

## II. *Background*

Article III, Section 4, of the New York State Constitution, provides that after each decennial Census, the New York State Senate and Assembly districts must be "readjusted or altered" so that each district contains, to the extent possible, "an equal number of inhabitants, excluding aliens, in as compact form as practicable." In 1978, as part of an appropriations bill, the New York legislature created an advisory Task Force on Demographic Research and Reapportionment ("LATFOR") to provide technical assistance to the New York legislature with respect to the task of redistricting Senate, Assembly, and Congressional districts. (*See* S.7302–A, A.9502–A (Jan. 17, 1978)). LATFOR consists of six members, of whom four are legislators and two are non-legislators. (*See id.* at 10). One non-legislator is appointed by the President Pro Tem of the Senate; the other by the Assembly Speaker. (*Id.*). In addition to its members, LATFOR has a staff, which includes two co-executive directors. (*Id.*; Bruno Resp. to Pls.' Interrog. No. 22; http://www.dasny.org/ dasny/board/board.shtml)(last visited July 25, 2003). LATFOR is authorized to hold public and private hearings and has all the powers of a legislative committee. (S. 7302–A, A.9502 at 11).

According to the LATFOR website, the non-legislators currently on the task force are Mark A. Bonilla, who was appointed by Senator Bruno, and Roman Hedges, who was appointed by Assembly Speaker Silver. (*See* http://www.latfor.state .ny.us) (last visited July 25, 2003). Mr. Bonilla is a lawyer with a private practice on Long Island. (*See* http://204.168.97.3/pressreleases.nsf/0/ 8513c44567fcb62985256b7400526a68?

---

**3.** Pursuant to Fed.R.Civ.P. 72(a), a party filing such objections would have to show that a portion of this Opinion and Order is "clearly erroneous or contrary to law."

OpenDocument)(last visited July 25, 2003). Dr. Hedges is a member of the Board of Directors of the New York State Dormitory Authority and also serves as Deputy Secretary of the New York State Assembly Committee on Ways and Means. (*See* http://www. dasny.org/ dasny/board/board.shtml)(last visited July 25, 2003).

After the plaintiffs commenced this action, LATFOR published its proposed Senate and Assembly redistricting plan on February 14, 2002. (Am. and Consol. Compl. ("Complaint" or "Compl.") ¶ 103). Thereafter, the New York Legislature adopted LATFOR's plan, which was signed into law by Governor Pataki in late April 2002. (*Id.* ¶ 104).

Following the adoption of a new legislative map, any aggrieved citizen may file an action in state court to seek review of the redistricting plan. N.Y. Uncons. L. § 4221 (McKinney 2000)("Section 4221"). Section 4221 provides that service of such a suit shall be made "upon the attorney-general, the president of the senate, the speaker of the assembly and the governor," by such means as the state court may direct. *Id.* Consistent with this procedure, the *Allen* lawsuit (02 Civ. 3239) was originally commenced in Supreme Court, New York County, but was later removed here. The *Rodriguez* suit (02 Civ. 618) was initially filed in this Court.

The Complaint in this action alleges that the defendants have underpopulated upstate Senate districts and overpopulated downstate Senate districts in a manner which causes the over-representation of upstate non-Hispanic white voters. (*See* Compl. ¶¶ 106–38). The plaintiffs contend that this intentional conduct violates the Equal Protection Clause of the Fourteenth Amendment and Section 2 of the Voting

Rights Act, 42 U.S.C. § 1973. (*Id.* ¶ 1; *see also* Pls.' Letter at 2). Several plaintiffs also have challenged the 2002 Congressional redistricting plan. (Compl.¶¶ 340–60). Finally, the plaintiffs accuse the defendants of racial gerrymandering in Senate District 34. (*Id.* ¶¶ 329–38).

Not surprisingly, in their answers to the Complaint, Senator Bruno and Assembly Speaker Silver deny many of the Plaintiffs' allegations. (*See* Docket Nos. 212, 216). In addition, both defendants allege as affirmative defenses that at least some of the plaintiffs lack standing and that the plaintiffs have failed to state a claim upon which relief can be granted. (*See* Docket Nos. 212 at 31–32, 216 at 38).[4] Neither defendant has asserted legislative immunity as an affirmative defense, nor have they sought to be dismissed from this action on that ground.

In or around September 2002, the plaintiffs served the defendants with a combined document demand and set of interrogatories through which they sought information concerning the process by which the 2002 redistricting maps were drawn and subsequently adopted by the Legislature. Senator Bruno, apparently acting on behalf of all the legislator-defendants, responded to these requests in October 2002. (*See* Pls.' Ex. 3). Thereafter, at the request of all of the parties, I stayed any further discovery proceedings pending the three-judge court's determination of the defendants' motion to dismiss the Complaint. (*See* Docket No. 189). That stay remained in effect until late last month when the court denied the motion.

III. *Discussion*

A. *Applicable Law*

1. *General Legal Principles*

 Because subject matter jurisdiction in this action is founded on the existence of

---

**4.** Speaker Silver also has asserted other affirmative defenses. (*See* Docket No. 212 at 31–

32).

federal questions, the availability of any privileges presents a question of federal common law. *See, e.g.,* Fed.R.Evid. 501 (privilege in federal question cases "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience"). "[T]estimonial exclusionary rules and privileges are not favored." *von Bulow v. von Bulow,* 811 F.2d 136, 141 (2d Cir.1987). This is so because they "contravene the fundamental principle that 'the public ... has the right to every man's evidence.'" *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)(quoting *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950)). Privileges consequently must be "strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.'" *Id.* (quoting *Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)(Frankfurter, J., dissenting)).

In this case, the defendants oppose the motion to compel based upon the interrelated principles of legislative immunity and legislative privilege.

### 2. *Legislative Immunity*

■ The doctrine of absolute immunity for state legislators is an outgrowth of the Speech or Debate Clause of the United States Constitution. Article I, Section 6, of the Constitution provides that "for any Speech or Debate in either House," Senators and Representatives "shall not be questioned in any other Place." When this legislative immunity applies, Senators and Representatives are shielded from any award of damages or prospective relief, and cannot be put to the "burden of de-

fending themselves." *Supreme Ct. of Va. v. Consumers Union of the U.S.,* 446 U.S. 719, 732, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980)(quoting *Dombrowski v. Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967)). The immunity, which has "taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries," *Tenney v. Brandhove,* 341 U.S. 367, 372, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), is consistent with our system of separation of powers and fosters the unrestrained debate that our forefathers deemed essential to democratic government. *Id.* at 372–74, 71 S.Ct. 783; *United States v. Helstoski,* 442 U.S. 477, 491–92, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979); *Eastland v. U.S. Servicemen's Fund,* 421 U.S. 491, 502, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975).

■ Although the federal Speech or Debate Clause, by its terms, applies only to Congress, many state constitutions contain similar provisions. *See Fla. Ass'n of Rehab. Facs. v. Fla. Dep't of Health & Rehab. Servs.,* 164 F.R.D. 257, 265 (N.D.Fla.1995)("As of 1981, 43 states had speech or debate clauses, and 5 exempted legislative members from arrest during a legislative session; Florida and North Carolina legislators alone had no specific constitutional protection."). In New York, Article III, Section 11, of the State Constitution echoes the federal language and provides that "[f]or any speech or debate in either house of the legislature, the members shall not be questioned in any other place." The New York Court of Appeals has held that this clause confers immunity for any acts which are an integral part of the legislative process. *People v. Ohrenstein,* 77 N.Y.2d 38, 53–54, 563 N.Y.S.2d 744, 565 N.E.2d 493 (1990). Furthermore, the clause shields New York legislators from the burden of having to defend against suits in the New York state courts arising out of their legislative acts. *Ur-*

bach v. Farrell, 229 A.D.2d 275, 656 N.Y.S.2d 448, 450 (3d Dep't 1997); *Straniere v. Silver*, 218 A.D.2d 80, 637 N.Y.S.2d 982, 985 (3d Dep't 1996).

■ Under the Supremacy Clause, a federal court clearly is not bound by the Speech or Debate Clause of the New York Constitution. *See United States v. Gillock*, 445 U.S. 360, 370, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980). Also, because the defendants are not federal lawmakers, the Speech and Debate Clause of the federal Constitution is not directly applicable. *Id.*

■ Federal courts nevertheless routinely accord state legislators "common-law immunity from liability for their legislative acts ... that is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause." *Consumers Union*, 446 U.S. at 732, 100 S.Ct. 1967 (citing *Tenney* ). State legislators therefore are entitled to the dismissal of Section 1983 suits brought against them to recover monetary damages or declaratory or injunctive relief. *Id.* at 732, 100 S.Ct. 1967; *Tenney*, 341 U.S. at 379, 71 S.Ct. 783. When common law legislative immunity applies, state legislators are immune from suit in federal court "to the same extent as their federal counterparts." *Star Distribs., Ltd. v. Marino*, 613 F.2d 4, 9 (2d Cir.1980). For that reason, common law legislative immunity for state legislators is absolute. *See Bogan v. Scott–Harris*, 523 U.S. 44, 46, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998)("It is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities."); *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210 (2d Cir.2003)("Legislators are entitled to absolute immunity from civil liability for their legislative activities.").

■ A modern-day legislature, of course, cannot operate strictly through the efforts of its members. As a consequence, "[t]he doctrine of legislative immunity is also applicable to legislative staff members, officers, or other employees of a legislative body, although it is considered 'less absolute' as applied to these individuals." *Marylanders for Fair Representation v. Schaefer*, 144 F.R.D. 292, 298 (D.Md.1992)(citing *Dombrowski v. Eastland*, 387 U.S. 82, 85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), and *Tenney*, 341 U.S. at 378, 71 S.Ct. 783).

### 3. Legislative Privilege

■ Closely related to the concept of legislative immunity is the concept of legislative privilege. Although the two doctrines are often discussed interchangeably, *see, e.g., Marylanders for Fair Representation*, 144 F.R.D. at 304 (referring to "testimonial legislative immunity"), there is one key difference. Legislative immunity entitles a state legislator, in an appropriate case, to the dismissal of all of the claims against him or her in the complaint, much as judicial immunity entitles judges to the dismissal of suits against them arising out of the performance of their judicial functions. *Consumers Union*, 446 U.S. at 733–34, 100 S.Ct. 1967; *Star Distribs.*, 613 F.2d at 6–7. Legislative privilege, on the other hand, is not absolute. *In re Grand Jury*, 821 F.2d 946, 957 (3d Cir.1987)("[S]uch privilege must be qualified, not absolute, and must therefore depend on a balancing of the legitimate interests on both sides."); *Fla. Ass'n of Rehab. Facs.*, 164 F.R.D. at 267 ("There probably is a qualified state legislative evidentiary privilege...."). Thus, courts have indicated that, notwithstanding their immunity from suit, legislators may, at times, be called upon to produce documents or testify at depositions. *See, e.g., Village of Arlington Heights v. Metro.*

*Hous. Dev. Corp.*, 429 U.S. 252, 268, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)("In some extraordinary instances [legislators] might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege."); *Carver v. Foerster*, 102 F.3d 96, 104 (3d Cir.1996)("judicial inquiry of legislative motive is not per se forbidden.").

In this action, Senator Bruno and the other legislator-defendants have not moved to dismiss the Complaint as against them on legislative immunity grounds.[5] Moreover, at least at this juncture, the plaintiffs are not seeking any depositions of legislators or their staffs. Accordingly, the narrow issue presented is whether Senator Bruno, Speaker Silver, and the other legislator-defendants are entitled to resist the limited discovery presently sought by the plaintiffs on the basis of the qualified legislative privilege. The plaintiffs contend that the legislator-defendants' effort to invoke legislative privilege to preclude this discovery necessarily fails for at least three reasons, each of which will be considered in turn.

### 4. *Alleged "Important Interests" Exception*

The first alleged exception to legislative privilege that the plaintiffs suggest is applicable here relates to cases in which the plaintiff seeks to vindicate important federal interests. (*See* Pls.' Letter at 4). The plaintiffs argue that this exception was given recognition in the Supreme Court's decision in *Gillock*, 445 U.S. at 370, 100 S.Ct. 1185.

In *Gillock*, a Tennessee legislator was indicted on federal charges arising out of his alleged taking of bribes and other financial improprieties. *Id.* at 362, 100 S.Ct. 1185. The defendant-legislator argued that the common law privilege for state legislators was as broad as the privilege afforded to members of Congress under the federal Speech or Debate Clause and therefore prohibited the introduction of any evidence at his federal criminal trial concerning his legislative acts and the motivations underlying them. *Id.* at 366, 100 S.Ct. 1185.

The Supreme Court noted that there are two related rationales for the protections accorded members of Congress under the Speech or Debate Clause of the United States Constitution: "the need to avoid intrusion by the Executive or Judiciary into the affairs of a coequal branch, and ... the desire to protect legislative independence." *Id.* at 369, 100 S.Ct. 1185. The Court found neither of these rationales applicable to the defendants. As the Court observed, the prosecution of a state legislator raised no separation of powers (or comity) concerns because the Supremacy Clause clearly contemplated that federal law would prevail in areas such as enforcement of the federal criminal laws which were specifically delegated to the federal government. *Id.* at 370, 100 S.Ct. 1185. Additionally, although the Court previously had held in *Tenney* that state legislators were immune from civil suits under Section 1983, *Gillock* noted that *Tenney* and its progeny had "drawn the line at civil actions." *Id.* at 373, 71 S.Ct. 783.

Following this discussion, the Court went on to observe in arguably broader language that "where important federal interests are at stake, as in the enforce-

---

**5.** The prior motion to dismiss, submitted on behalf of Senator Bruno, Speaker Silver, Governor Pataki, Attorney General Spitzer, and others, alleged that the plaintiffs lacked standing and that four counts of the Complaint failed to state a claim upon which relief could be granted. (*See* Docket No. 199).

ment of federal criminal statutes, comity yields." *Id.* The Court noted that a similar result had been reached in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), where the President's claim of executive privilege was subordinated to the need to enforce the federal criminal laws.

The parties divine different rules from *Gillock.* The plaintiffs emphasize the first clause quoted above, arguing that "where important federal interests are at stake" no common law legislative privilege is available to a state legislator in federal court. (Pls.' Letter at 4). They further contend that the unlawful denial or diminution of voting rights is such an important federal interest. (*Id.*) The defendants stress the second clause, suggesting that *Gillock* simply defined the outer boundaries of the legislative privilege in a manner which precludes its invocation in a federal criminal case. (Defs.' Letter at 5).

Following *Gillock,* in *In re Grand Jury,* the Third Circuit also considered the availability of a federal privilege for state legislators in the context of a criminal investigation. In that case, the United States Attorney sought to compel certain state legislators to comply with a federal grand jury subpoena seeking records related to a state legislative committee's investigation of alleged contract fraud. *In re Grand Jury,* 821 F.2d at 948, 950. Balancing the needs of the prosecutor against the legislators' need to protect their thought processes, the district court quashed much of the subpoena, but required disclosure of the identities of the witnesses appearing before the committee and any documents written by persons not associated with the committee members which could not be obtained through other means. *Id.* at 950.

On appeal, the Third Circuit was critical of the district court's case-specific approach to determining the availability of the legislative privilege. *Id.* at 955. As the court explained, "[s]uch a narrow focus was in error because a court must first decide whether a qualified privilege exists or should exist before deciding how to apply it in a particular case." *Id.* After a lengthy analysis, the court concluded that "[n]either the threat of harassment, the dangers of distraction, nor the potential disruption of confidential communications justified a qualified privilege for the full range of legislative activities normally protected by the [federal] Speech or Debate Clause." *Id.* at 958. Nevertheless, the court did not preclude the district court, on remand, from applying a more narrowly-tailored privilege which would shield from disclosure the legislature's confidential deliberations, but not any underlying factual information. *Id.* at 958–59. The court further held that the district court could, if necessary, order an *in camera* inspection of the disputed documents. *Id.* at 959.

Similarly, in *Fla. Ass'n of Rehab. Facs.,* the court concluded that there "probably is a qualified state legislative evidentiary privilege" in federal court. *Fla. Ass'n of Rehab. Facs.,* 164 F.R.D. at 267. Describing *In re Grand Jury* as "the most persuasive authority" for the scope of that privilege, the court stated that "if any privilege should be recognized ..., it should be a 'deliberate process privilege.'" *Id.* *See also Searingtown Corp. v. Inc. Village of North Hills,* 575 F.Supp. 1295, 1299 (E.D.N.Y.1981)(honoring the defendants' assertion of privilege insofar as the plaintiffs sought to compel the defendants "to answer questions relating to their motivations and deliberations regarding legislation they enacted").

The deliberative process privilege that the courts have applied in such circumstances is more typically asserted in cases which challenge the decisions of adminis-

trative agencies. That privilege " 'protects the decisionmaking processes of the executive branch in order to safeguard the quality and integrity of governmental decisions.' " *A. Michael's Piano, Inc. v. F.T.C.*, 18 F.3d 138, 147 (2d Cir.1994)(quoting *Hopkins v. U.S. Dep't of Hous. and Urban Dev.*, 929 F.2d 81, 84 (2d Cir.1991)). In *Hopkins*, the Second Circuit explained the two-fold showing that an agency must make to invoke the deliberative process privilege:

> First, the document must be "predecisional," that is, "prepared in order to assist an agency decisionmaker in arriving at his decision." Second, the document must be "deliberative," that is, "actually . . . related to the process by which policies are formulated." Thus, the privilege "focus[es] on documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.' "

*Hopkins*, 929 F.2d at 84–85 (internal citations omitted).

In the agency context, the deliberative process privilege "does not, as a general matter, extend to purely factual material." *Id.* at 85. Moreover, even when the deliberative process privilege applies, it is a qualified privilege which may be overcome upon a showing that the adverse party's need for disclosure outweighs the interest in confidentiality. *See In re Franklin Nat'l Bank Secs. Litig.*, 478 F.Supp. 577, 583 (E.D.N.Y.1979). At least one court has found that this balancing test precludes the assertion of the deliberative process privilege in a case involving the Voting Rights Act. *See United States v. Irvin*, 127 F.R.D. 169, 173–74 (C.D.Cal. 1989). *See also Corporacion Insular de Seguros v. Garcia*, 709 F.Supp. 288, 298 (D.P.R.1989)(declining to apply the deliberative process privilege to state legisla-

tors and directing the disclosure of documents because the legislature is the "part of the governmental branch that has historically has been subjected to the greatest degree of public accountability").

Perhaps the case closest to the facts of this action is *Marylanders for Fair Representation*. There, the Maryland Constitution provided for redistricting to begin with the Governor's submission of a proposed redistricting plan to the state's General Assembly. *See Marylanders for Fair Representation*, 144 F.R.D. at 295. Pursuant to the Maryland Constitution, if the General Assembly failed to enact its own plan within forty-five days, the Governor's plan would become law. *Id.* Following the 1980 Census, the Governor developed his plan with the assistance of an ad hoc five-member advisory committee, which consisted of two legislators and three private citizens. *Id.* at 296. When the Governor submitted his plan for approval, the General Assembly failed to take any action; as a result, the Governor's plan became law. *Id.*

On these facts, the three-judge court unanimously concluded that the legislators on the Governor's ad hoc committee were entitled to absolute immunity, and it dismissed the complaint as against them. *Id.* at 301. All three judges further agreed that the Governor's actions in preparing legislation for the General Assembly were akin to those typically undertaken by a legislator or legislative aide, and that the Governor was therefore also entitled to legislative immunity. *Id.* at 300–01. Where the judges parted company, however, was in their consideration of the extent to which pretrial discovery could explore the rationale underlying the Governor's redistricting plan. Citing *Corporacion Insular* and *Helstoski*, among other cases, all three judges apparently agreed that the *documentation* prepared by the committee

was subject to disclosure unless it was shielded by a privilege other than the legislative privilege. *Id.* at 302 n. 20. The majority further concluded that the private citizen members of the Governor's committee could be compelled to provide deposition testimony concerning the committee's deliberations. *Id.* at 304–05. Finally, although the court unanimously held that the legislator-defendants' privilege precluded their being deposed as to any action that they took once the Governor's plan reached the General Assembly (unless they were later designated as trial witnesses), the majority did not rule out the possibility of deposing the legislators about their prior actions as committee members. *Id.* at 302, 305. A final decision on this question was deferred until the private members of the committee had been deposed and a fuller factual record was available. *Id.* at 305.

5. *Alleged Exception for Cases in Which the Decisionmaking Process is an Issue*

The second exception to the qualified privilege for state legislators that the plaintiffs urge upon the Court relates to cases in which the legislative decisionmaking process is central to the plaintiff's claim. (*See* Pls.' Letter at 6). The plaintiffs read this purported exception into the decision in *In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency,* 145 F.3d 1422, 1424 (D.C.Cir.1998). That case, however, did not involve an attack on the acts of a state legislature. Instead, the issue presented was whether the executive branch of the federal government, in the form of the Federal Reserve Board and Comptroller of the Currency, could resist a subpoena based upon the deliberative process privilege. *See id.* at 1422. The plaintiff trustee in bankruptcy served that subpoena in an effort to adduce evidence that the

FDIC had improperly caused assets to be transferred to an insolvent bank from its insolvent corporate parent in order to reduce the FDIC's financial exposure. *Id.* at 1423. The Court of Appeals for the District of Columbia Circuit held that the qualified deliberative process privilege applies in cases "where the governmental decisionmaking process is collateral," but not when "the plaintiff's cause of action is directed at the government's intent." *Id.* at 1424. As the court explained, the deliberative process privilege is intended to avoid chilling governmental decisionmaking. *Id.* The court found that "if either the Constitution or a statute makes the nature of the governmental officials' deliberations *the* issue, the privilege is a nonsequitor." *Id.* (emphasis in original).

The plaintiffs have pointed to no authority in the Second Circuit expressly adopting the view that the legislative or deliberative process privilege is unavailable whenever a plaintiff's claim calls into question the legislature's decisionmaking processes. Were that a basis for denying a defendant's legislative privilege claim, there would be few, if any, cases in which state legislators could shield their personal thought processes from view. For example, as the plaintiffs apparently argue, the legislative privilege could never be asserted in a redistricting case alleging a violation of the Voting Rights Act. No decision cited by the plaintiffs appears to have gone this far.

Nonetheless, as noted above, the cases discussing both the legislative and deliberate process privileges make clear that these protections are only "qualified." Accordingly, either privilege may be overridden in circumstances where "reason and experience" suggest that the claim of privilege should not be honored. *See* FED.R.EVID. 501; *Manzi v. DiCarlo,* 982 F.Supp. 125, 131 (E.D.N.Y.1997)(indicating

that the court needs to "balanc[e] the various competing interests" to determine whether to apply the deliberative process or state legislative privilege to shield the legislature's documents from discovery); *In re Franklin Nat'l Bank Secs. Litig.,* 478 F.Supp. at 583 (setting forth the factors to consider).

### 6. *Waiver*

Finally, the plaintiffs contend that even if the defendants could assert a legislative or deliberative process privilege, they have waived their right to do so through their active participation in this action. (Pls.' Letter at 7). They base this contention, in part, on the Third Circuit's decision in *Powell v. Ridge,* 247 F.3d 520, 525 (3d Cir.2001). In *Powell,* several leaders of the Pennsylvania General Assembly intervened in a suit brought against the Governor of Pennsylvania, among others, to challenge the state's method of funding public education, but sought to resist disclosure of their files based upon their legislative privilege. *Id.* at 522.

On appeal, the Third Circuit noted that the legislator-defendants could have sought dismissal of the claims against them on legislative immunity grounds, but were instead "self-made defendants," who were seeking to assert an entirely different form of protection, which would "enable them to seek discovery, but not respond to it; take depositions, but not be deposed; and testify at trial, but not be cross-examined." *Id.* at 525. The court also observed that the issues raised by the plaintiffs could have been resolved in a lawsuit naming as defendants only the executive officers charged with carrying out the legislature's decisions. *See id.* at 529 (Roth, J., concurring). On these facts, the court held that the privilege being advanced by the legislator-defendants was one which "does not exist." *Id.* at 525.

### B. *Application of Law to Facts*

#### 1. *Legislative Immunity*

■■■ The plaintiffs' motion to compel does not seek any relief which requires this Court to determine whether Senator Bruno, Speaker Silver, and the remaining legislator-defendants are entitled to claim legislative immunity on the facts of this case. Indeed, any such determination would plainly be beyond the limited scope of the three-judge court's reference to me. Nevertheless, even if the legislator-defendants had asserted legislative immunity as a defense, and the Court had concluded that they were protected by its mantle, a legislator may be required to disgorge documents or provide other information in appropriate circumstances. *See, e.g., Village of Arlington Heights,* 429 U.S. at 268, 97 S.Ct. 555 ("In some extraordinary instances [legislators] might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege."); *Carver,* 102 F.3d at 104 ("judicial inquiry of legislative motive is not per se forbidden.").

#### 2. *Legislative Privilege*

■■■ Whether the privilege that the legislator-defendants seek to assert is characterized as a legislative or a deliberative process privilege, it is, at best, one which is qualified. *In re Grand Jury,* 821 F.2d at 957; *In re Grand Jury Subpoena dated August 9, 2000,* 218 F.Supp.2d 544, 553 (S.D.N.Y.2002). Accordingly, in deciding whether and to what extent the privilege should be honored, the Court must balance the extent to which production of the information sought would chill the New York State Legislature's deliberations concerning such important matters as redistricting against any other factors favoring disclosure. Among the factors

that a court should consider in arriving at such a determination are: "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *In re Franklin Nat'l Bank Secs. Litig.*, 478 F.Supp. at 583 (internal citations omitted).

In this case, many of the plaintiffs' requests do not seek information concerning the Legislature's apparently brief consideration of a redistricting bill. To the extent that they focus instead on LATFOR's activities, which involved the participation of nonlegislators (at least one of whom evidently was not a governmental employee), their inquiry is arguably less invasive of the Legislature's prerogatives. *See Fla. Ass'n of Rehab. Facs.*, 164 F.R.D. at 267 (recognizing privilege for communications between elected legislators and their "personal staff members," but "less reason for a 'deliberative process' privilege as to legislative employees who provide information to legislators collectively, as, for example, technical employees of a standing committee who do not advise a particular legislator as his or her personal staff.").

In *Marylanders for Fair Representation*, the court acknowledged that any changes that may have been made to a proposed redistricting plan once it reaches the floor of the legislature, and the rationale therefore, fall squarely within the legislative or deliberative process privilege. *Marylanders for Fair Representation*, 144 F.R.D. at 302. Nevertheless, actions which are legislative do not begin only when a bill reaches the floor of the legislature. *Id.* at 300–01. As every high school student knows, the process of drafting legislation is also an important part of how a bill becomes law.

In this case, the 2002 redistricting plan was developed by LATFOR, an advisory group which, by statute, has the powers of a legislative committee. It does not follow, however, that LATFOR was necessarily acting at the earlier stages of the redistricting process solely as the surrogate of Senator Bruno or other individual members of the Legislature. Moreover, pursuant to its own prior enactment, the Legislature introduced into the process as mandatory participants two non-legislative members of LATFOR. By delegating the complex process of developing a redistricting plan in this manner, the Legislature created a working group which, by statute, necessarily contained legislative "outsiders." While the political reality may be that these "outsiders" are consummate insiders (Dr. Hedges, for example, also serves as the Secretary of an Assembly committee), the fact that LATFOR was constituted in this fashion tends to weaken any claim that the disclosure of LATFOR's deliberations and documents would cause future members of the Legislature not to engage in frank discussions of proposed legislation. Indeed, the legislatively-mandated structure of LATFOR makes its workings more akin to a conversation between legislators and knowledgeable outsiders, such as lobbyists, to mark up legislation—a session for which no one could seriously claim privilege.

Turning to the relevance of the LATFOR materials, the defendants suggest that the scales tip in their favor because federal courts "*routinely* resolve questions of whether a law has an unconstitutional purpose . . . without compelling testimony by legislators or allowing discovery into confidential legislative materials." (Defs.' Letter at 11)(emphasis in original). They note further that many of the plaintiffs'

claims arise under Section 2 of the Voting Rights Act, which, as amended, looks to the discriminatory results of a reapportionment plan, not the legislature's allegedly discriminatory purpose, in determining whether a plan should be upheld. (*Id.* at 13). While evidence of discriminatory animus may not be an essential element of all of the plaintiffs' claims, it certainly is something that can be considered in deciding whether the New York Legislature's 2002 redistricting plans pass judicial muster. *See, e.g., Village of Arlington Heights,* 429 U.S. at 268, 97 S.Ct. 555 ("contemporary statements by members of the decisionmaking body, [and] minutes of its meetings or reports" may be "highly relevant" in "determining whether racially discriminatory intent existed"); *Irvin,* 127 F.R.D. at 171 (noting that after the 1982 amendments to the Voting Rights Act, "circuit courts have held that plaintiffs may carry their burden by fulfilling *either* the more restrictive intent test or the results test")(quoting *McMillan v. Escambia County,* 748 F.2d 1037, 1046 (5th Cir.1984)) (internal quotation marks omitted). The defendants also have not shown that this evidence could be obtained through other means. Their argument that the discovery sought by the plaintiffs is either irrelevant or unnecessary is consequently unavailing.

Additionally, although this suit is not brought on behalf of the United States, there can be no question that it raises serious charges about the fairness and impartiality of some of the central institutions of our state government. This, too, suggests that the qualified legislative or deliberative process privilege should be accorded only limited deference.

Finally, I note that the portion of this action which challenges the State Senate districts was commenced in state court pursuant to Section 4221—a provision which required that Senator Bruno and Speaker Silver be served with process. Following its removal to this Court, neither of these defendants sought to have the Complaint dismissed as against them on legislative immunity grounds. Although the legislator-defendants contend that Section 4221 obligates them to remain in this suit, this is by no means clear. The express terms of the statute require only that certain state officials be given notice of the suit through service of process. This does not necessarily compel their participation in the suit as parties.[6] Thus, as in *Powell,* the legality of the redistricting plan enacted by the Legislature could conceivably have been fully explored in a suit which named as a defendant only the Governor, the executive charged with its execution. *See Powell,* 247 F.3d at 529 (Roth, J., concurring). It also bears mention that another defendant in this suit is the New York State Attorney General. Even if the Attorney General does not have a statutory duty to defend this suit, *see* N.Y. Exec. L. § 71 (McKinney 2001), the fact remains that he has answered the Complaint and is participating in the defense. (*See* Docket No. 214).

■■■■■ For all these reasons, I conclude that the plaintiffs' motion to compel should be granted insofar as it seeks information concerning the operations of LATFOR which is not protected by a privilege

---

**6.** The Federal Rules of Civil Procedure, for example, require that service of process on the United States be effected by delivering a copy to the United States Attorney, or his designee, in the district where the action is brought, sending a copy to the Attorney General, and when the order of an officer or agency of the United States is challenged, sending an additional copy to the officer or agency. *See* Fed.R.Civ.P. 4(i)(1). This does not require that any person other than the United States actually be named as a defendant in such a suit.

other than the legislative privilege. Conversely, to the extent that the plaintiffs seek information concerning the actual deliberations of the Legislature—or individual legislators—which took place outside LATFOR, or after the proposed redistricting plan reached the floor of the Legislature, the motion must be denied. *Cf. Corporacion Insular,* 709 F.Supp. at 292, 296–97 (allowing document discovery, but not depositions of legislators or their aides).

### 3. *Waiver*

██ A more extensive disclosure of information would, of course, be warranted if the defendants waived their claim of privilege through their participation in this action. While the burden with respect to this issue ordinarily rests with the proponent of the privilege, who must establish its nonwaiver, *see United States v. Weissman,* Docket No. S1 94 Cr. 760(CSH), 1996 WL 737042, at *25 (S.D.N.Y. Dec. 26, 1996)(collecting cases), the defendants in this action have made a colorable claim that Section 4221 requires their continued participation. In the absence of any case law establishing that their interpretation of the statute is incorrect, I decline, at least at this juncture, to find that they have waived their qualified privilege in its entirety.

### 4. *Senator Bruno's Privilege Assertions*

As I indicated to counsel during our recent telephone conference, Senator Bruno's privilege log is in many respects insufficiently specific to permit one to determine whether particular documents are privileged or not. (*See* Pls.' Ex. 4). For example, one document on the privilege log, which is said to be protected by both the legislative and attorney-client privileges, is described only as an "Internal Memorandum (computer file)" concerning "Potential changes to Senate Districts." (*Id.* at 1). Without further details, it is impossible for the plaintiffs to consider—or this Court to determine—whether this is document was prepared during the course of LATFOR's work or at a later stage once the redistricting plan was formally before the Legislature. Moreover, to the extent that attorney-client privilege is claimed, the defendants have not even indicated the name of the attorney or the person with whom the attorney was communicating.[7]

Although the log is plainly insufficient to sustain the defendants' burden of establishing a basis for their assertions of privilege, it does comply with the minimal burdens imposed by Rule 26(b)(5) of the Federal Rules of Civil Procedure and Local Civil Rule 26.2(a)(2). Greater detail

---

7. As the plaintiffs correctly point out, the opaqueness of Senator Bruno's log is particularly troubling insofar as attorney-client privilege is concerned since the defendants arguably may have waived their right to assert that privilege by choosing to publish on the LATFOR website a memorandum concerning the size of the Senate which Michael Carvin, who serves as Senator Bruno's counsel in this action, sent to Senators Bruno and Skelos on or about March 7, 2002. (*See* http://latfor.state.ny.us/docs/20020308)(last visited July 25, 2003). In that memo, which apparently was prepared less than one month before the redistricting bill was introduced in the Senate

and Assembly, Mr. Carvin concludes, "[a]fter examining the relevant provisions of the New York Constitution, case law and historical evidence, . . . that the best way to implement the New York and federal requirements governing apportionment" is to make changes in several downstate counties which, if adopted, would increase the size of the New York State Senate from 61 to 62 senators. (*Id.*). This one-member change forms the basis for many of the plaintiffs' allegations of discriminatory animus in this action. (*See* Compl. ¶¶ 102–04; Tr. of June 20, 2003 oral argument (remarks of Richard Emery, Esq., terming this last minute change "very suspicious")).

obviously is necessary now that the defendants' withholding of many of the documents that the plaintiffs seek has been found unjustified.

Due to the schedule set by the three-judge court, time is of the essence. For this reason, I previously instructed counsel to confer informally, even in advance of the issuance of this Opinion and Order, with regard the discoverability of particular documents on Senator Bruno's initial privilege log. Additionally, I advised counsel that, to the extent that their disagreements concerning privilege could not be resolved informally, the defendants would have to submit a more detailed log, accompanied by such additional evidence as may be necessary to sustain their burden of establishing that each document withheld is, in fact, subject to an evidentiary privilege that this Court has recognized. *See generally A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, Docket No. 97 Civ. 4978(LMM)(HBP), 2002 WL 31385824, at *6 (S.D.N.Y. Oct. 21, 2002)(recommending a similar procedure). To ensure that the parties and the Court can have a meaningful discussion, each document on any revised privilege log should also be Bates numbered or otherwise separately identified.

A further pretrial telephone conference has been scheduled for July 31, 2003, at 5:00 p.m. The defendants are instructed to serve their revised privilege log by that time. During the conference, in addition to any other issues that the parties may wish to raise, the Court will consider the method by which any lingering privilege disputes will be resolved.

## IV. *Conclusion*

The plaintiffs' letter-motion to compel is granted in part and denied in part. The legislator-defendants' claims of legislative or deliberate process privilege are sus-tained only insofar as the plaintiffs seek to intrude on deliberations or discussions which took place after the proposed 2002 redistricting plan reached the Legislature's floor. Accordingly, the defendants are instructed to respond to the plaintiffs' discovery requests concerning LATFOR, unless they contend that another privilege is applicable. If the legislator-defendants continue to claim privilege with respect to any of the documents on Senator Bruno's privilege log, counsel shall confer in an effort to resolve their differences. If the privilege concerns raised by the log cannot be resolved informally, the defendants are instructed to serve a revised privilege log before the July 31, 2003 telephone conference.

SO ORDERED.